Paul **KORDENBROCK**, Petitioner,

v.

Gene **SCROGGY**, Warden, Kentucky State Penitentiary, Respondent.

Civ. A. No. 86–186.

United States District Court, E.D. Kentucky, Covington Division.

Feb. 16, 1988.

Edward C. Monohan, Timothy T. Riddell, Dept. of Public Advocacy, Frankfort, Ky., for petitioner.

Penny R. Warren, Cicely Jaracz Lambert, Frankfort, Ky., for respondent.

## OPINION AND ORDER

BERTELSMAN, District Judge.

Petitioner, Paul Kordenbrock, received the death penalty after he was convicted of murder by a jury in a Kentucky trial court. His appeal was affirmed by the Kentucky Supreme Court. The case is now before this court for habeas corpus review. 28 U.S.C. § 2254.

The background facts of this case were ably presented by the Kentucky Supreme Court in *Kordenbrock v. Commonwealth,* 700 S.W.2d 384 (Ky.1985). The Court there stated as follows:

"The crimes were committed in a Western Auto Store owned by William Thompson. Two days prior to the incident, Kordenbrock and a friend, Michael Kruse, entered the store, browsed around, and looked at wood-cutting tools. Thompson observed them and became suspicious of their actions. The next day Kordenbrock and Kruse again visited the store, looked at guns in a glass display case, and purchased a small hatchet. Kordenbrock asked Thompson to show one of the guns in the case. Thompson again became suspicious of their motives for visiting the store. Thompson was alone in the store on both visits.

"On the day of the murder, Kordenbrock, armed with a pistol, and Kruse entered the store about 9:30 a.m. Pointing the gun, Kordenbrock ordered Thompson and his employee, Allen, to the rear of the store and ordered them to lie face down. Kordenbrock stood over them. A customer entered the store, and Kruse answered a query about repair of chain saws. The customer left. Thompson heard glass break in the store, then heard a shot, and felt a searing sensation on the back of his head. He then heard a second shot. Allen was dead from the gunshot wound. Thompson survived.

"Kordenbrock and Kruse divided the stolen guns after leaving the store. About 10:00 a.m., they arrived at the residence of a friend, Gary Ramell. Kordenbrock sold Ramell two of the guns. Ramell testified Kordenbrock appeared mellow, and nothing seemed to be unusual.

"Next, the pair arrived at the home of Richard Fehler. Kordenbrock sold Fehler two guns. Fehler testified that the pair seemed jittery and that Kordenbrock took Quaaludes.

"The following day Kordenbrock drove to a cousin's house, and a Larry Hensley arrived and negotiated with Kordenbrock over the purchase of the guns.

"In the meantime, Ramell had seen a news story about the murder and robbery. When Kordenbrock returned from his cousin's, Ramell questioned him about where the guns came from; he had noticed they were in a Western Auto box. Ramell, Fehler, and Hensley cooperated with the police and testified at the trial.

"Hensley loaned the police his truck after he arranged to meet Kordenbrock to pay for the guns he had purchased. Kordenbrock was arrested at 10:10 p.m., and after interrogation, made a full confession.

"Thompson testified at trial and identified Kordenbrock. Kordenbrock testified at trial and offered testimony that he was intoxicated and on drugs and did not intend to shoot or kill either of the men. After a finding of guilt, the same jury heard testimony in the penalty phase of the trial and recommended the death penalty."

*Id.* at 385–86.

Kordenbrock now seeks a writ of habeas corpus from this court claiming twenty-

three assertions of error. Further facts as appropriate will be set forth in connection with the discussion of the various issues.

### ISSUE I—Was petitioner improperly deprived of a court appointed defense psychiatrist?

■ At first glance, the facts relevant to the issue concerning appointment of the psychiatrist in this case seemed confused. However, a final evidentiary hearing clarified the circumstances and the issue is not as difficult to resolve as it first appeared.

Briefly this is what happened. Early on, counsel for the defense in this case determined that there was no possibility of an insanity defense or of claiming that Kordenbrock was incompetent to stand trial. Counsel hoped, however, to be able to raise a defense of diminished responsibility based on Kordenbrock's habitual use of drugs. Also, counsel wanted to secure the evaluation of a psychiatrist for possible use in mitigation. Therefore, counsel moved the state trial court for appointment of a defense psychiatrist. The court granted the motion pursuant to KRS 31.110(1). The defense arranged for Dr. Nizny to act as psychiatrist and had Kordenbrock evaluated by him. Based on the evidentiary hearing and the testimony of Dr. Nizny, the court finds that his preliminary report to defense counsel was unfavorable in that it had to include the fact that defendant had committed another murder the night before he committed the one in question and also that he had an "anti-social personality," that is, he had no regard for the rights of his fellow man or woman. Also, Dr. Nizny concluded and reported that it could not be said that rehabilitation was probable.

For these reasons, it was apparent that the testimony of Dr. Nizny would not be helpful to Kordenbrock's case. However, able defense counsel saw an ingenious way to turn this dilemma to Kordenbrock's advantage.

At that time, there was an ongoing dispute between Boone County and the Commonwealth of Kentucky as to who would pay for experts required by statute to be appointed to assist indigent criminal defendants. Counsel knew from previous cases that the Boone County Fiscal Court would initially refuse to pay Dr. Nizny. Therefore, counsel accurately represented to the court that Dr. Nizny would not file a report and testify unless some public agency would acknowledge that it was responsible for payment for his services. Counsel secured orders from the Boone Circuit Court requiring payment but made no meaningful efforts to enforce them. The court finds that this was a deliberate defense tactic to create an appealable issue, and that the testimony of Dr. Nizny was not really desired by or useful to the defense. The court finds that no competent defense counsel would have called Dr. Nizny to testify and calling him to testify might have constituted ineffective assistance of counsel. This finding is based on the testimony of Dr. Nizny himself. As part of that testimony, he drew up and filed a report on his evaluation of Kordenbrock just prior to the evidentiary hearing in this court. This report would not have been helpful to Kordenbrock. Further, Dr. Nizny testified that he never insisted on advance payment or partial payment, but only wanted some official assurance of payment.

Further, Dr. Nizny testified that he would have honored a subpoena from the state court even though served on him in Ohio. This service was not accomplished although it could easily have been. Further, defense counsel did not take the obvious step of bringing the matter to a head by moving to hold one or more county officials in contempt or levying on a county bank account, which would then have allowed the county to appeal and secure a ruling from a higher state court.

The court has had the opportunity to observe defense counsel in this and other cases and he is far too capable to overlook these obvious steps, if the testimony of the psychiatrist had really been desired. Therefore, the court finds that failure to obtain the psychiatrist was a deliberate defense tactic.

When Dr. Nizny refused to cooperate, the trial court ordered Kordenbrock evalu-

ated by a neutral psychiatrist at a state facility. Although Kordenbrock was transferred to the state facility, on the advice of counsel he refused to cooperate with the psychiatrists there by not giving them an adequate history. The court finds that this was also a deliberate strategy by able defense counsel because he knew from Dr. Nizny's preliminary report, which any competent counsel would have secured before requesting a written report, that psychiatric testimony would probably not be of help to Kordenbrock.

The court finds that, had Kordenbrock cooperated with the doctors at the state facility, testimony could have been obtained from them in both the guilt and penalty phases, but that the testimony would have been neutral and would probably have included an opinion that it was unlikely that Kordenbrock would in the future refrain from criminal dangerous behavior if he was ever released. The court finds that the testimony could have been obtained in spite of the formal policy of the Department to provide psychiatric evaluations solely on competency and insanity by the device of subpoenaing the doctors from the facility to testify to their opinions on these subjects. However, defense counsel quite properly determined that a neutral evaluation would not help his client's case and, therefore, as a deliberate defense strategy advised his client not to cooperate. All of this was entirely proper and indeed required of an able defense attorney, but the defense cannot have it both ways. It cannot turn down a neutral psychiatric evaluation and then claim an error that it was deprived of such evaluation.

In *Ake v. Oklahoma*, 470 U.S. 68, 105 S.Ct. 1087, 1097, 84 L.Ed.2d 53 (1985), the Supreme Court of the United States discussed the circumstances when an indigent defendant in a capital case is entitled to a court-appointed psychiatrist. The holding of *Ake* is that he is entitled to such assistance.

The narrow holding of *Ake* is that a defendant in a capital case is entitled to be evaluated by a court appointed neutral psychiatrist, if his sanity is in issue or if the state introduces psychiatric testimony in the penalty phase. Neither of these situations prevails here.

The language of *Ake* is somewhat broader than this, however, and the *Ake* holding has been expanded by some of the lower courts. Thus, it has been implied that *Ake*, when read together with *Caldwell v. Mississippi*, 472 U.S. 320, 105 S.Ct. 2633, 2637 n. 1, 86 L.Ed.2d 231 (1985), requires the appointment of a defense expert whenever one is reasonably required by an indigent defendant and specifically requested by his counsel. *See Moore v. Kemp*, 809 F.2d 702 (11th Cir.1987) (dicta); *Messer v. Kemp*, 831 F.2d 946 (11th Cir.1987) (dicta, but dissenting opinion would so hold); *Clark v. Dugger*, 834 F.2d 1561 (11th Cir.1987); *Little v. Armontrout*, 835 F.2d 1240 (8th Cir. 1987) (hypnosis expert). *But see Clark v. Dugger*, 834 F.2d 1561 (11th Cir.1987) (*Ake* limited to insanity issue).

However, in the light of this court's factual findings, detailed above, concerning the defense tactics with regard to the psychiatrist issue in this case, it appears that none of these cases are applicable. Also, such findings make it clear that if any error occurred, it was harmless beyond a reasonable doubt. Thus, it is unnecessary for this court to resolve the conflicting interpretations of the law exemplified by the above authorities. Also, all that petitioner would have been entitled to in any event was evaluation by a neutral psychiatrist. He was offered this by the court but waived the opportunity to be evaluated on the advice of counsel, as discussed above.

The court further finds that petitioner secured adequate expert assistance on the guilt phase from the psychopharmacologist who did testify.

Therefore, there is no merit to the petitioner's contention with regard to the trial court's failure to appoint a psychiatrist.

*ISSUE II—Whether the petitioner had his constitutional rights violated because the prosecutor repeatedly stated the jury's determination concerning the death penalty was a "recommendation" to the trial judge.*

■ During *voir dire* of the jury members, the prosecutor stated that their func-

tion, if they found the petitioner guilty of intentional murder, could involve "recommending" the death penalty to the trial judge. The prosecutor also used the word "recommend" in his opening and closing arguments. The trial court judge also used the word "recommend" during the penalty phase instructions.

Petitioner asserts that such use of the word "recommend" was reversible error under *Caldwell v. Mississippi*, 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985). The Commonwealth, on the other hand, contends that there was no reversible error because such language did not mislead the jury into thinking its "awesome responsibility" rested elsewhere.

In *Caldwell*, the state prosecutor made statements to the jury members indicating that their decision as to whether or not to give the death penalty was automatically reviewable by the appellate court. The Supreme Court in *Caldwell* concluded "that it is constitutionally impermissible to rest a death sentence on a determination made by a sentencer who has been led to believe that the responsibility for determining the appropriateness of the defendant's death rests elsewhere." 105 S.Ct. at 2639.

After careful study of the transcripts, this court concludes that this situation is different from the one presented in *Caldwell*. In *Caldwell*, the state prosecutor sought to, and in fact did, minimize the jury's sense of importance in its role. 105 S.Ct. at 2637, 2639. Here, Kentucky law states that the function of the jury in a death penalty case is to "recommend a sentence for the defendant." [1] The prosecutor merely reiterated this point. The ultimate question is not whether the prosecutor used the word "recommendation," but rather whether the prosecutor "divert[ed] from the minds of the jurors their true responsibility...." *Ward v. Commonwealth*, 695 S.W.2d 404, 408 (Ky.1985). Furthermore, "use of the word 'recommend' is not incorrect as long as the context in which it is used does not mislead the jury as to its role in the process or its responsibility in exercising its sentencing function." *Matthews v. Commonwealth*, 709 S.W.2d 414, 421 (Ky.1986).

The Kentucky Supreme Court in this case concluded that the "word 'recommend' was used, but not to such an extent as to denigrate the responsibility of the jury in imposing a death penalty." *Kordenbrock v. Commonwealth*, 700 S.W.2d 384, 389 (Ky.1985). Clearly no error occurred in the prosecutor's opening and closing or during the instructions because the word "recommendation" was used to enable the jury to better visualize its statutory role. On other occasions the prosecutor used the word "recommendation" at the bench and out of the hearing of the jury so no harm occurred whatsoever. The prosecutor also used the word "recommendation" on several occasions during *voir dire* of the individual jurors. The prosecutor stated that, if the petitioner were found guilty, the jury could make a recommendation of death, and although the judge would not be bound by such recommendation he would give it great weight. *See, e.g.,* Trial Transcript of the Evidence (hereinafter T.E.), Vol. XIX 2825 and Vol. XVII 2425. However, these statements do not present a situation similar to *Caldwell* or *Ward* where the jury

---

1. Kentucky Revised Statute (hereinafter KRS) § 532.025(1)(b) states:

"(b) In all cases in which the death penalty may be imposed and which are tried by a jury, upon a return of a verdict of guilty by the jury, the court shall resume the trial and conduct a presentence hearing before the jury. Such hearing shall be conducted in the same manner as presentence hearings conducted before the judge as provided in paragraph (a) of this subsection.... Upon the conclusion of the evidence and arguments, the judge shall give the jury appropriate instructions, and the jury shall retire to determine whether any mitigating or aggravating circumstances, as defined in subsection (2) of this section, exist *and to recommend a sentence for the defendant.* Upon the findings of the jury, the judge shall fix a sentence within the limits prescribed by law." (Emphasis added)

Although the jury "recommends" a sentence, its sense of responsibility remains undiminished because the death penalty cannot be assessed by any judge unless recommended by the jury. *Ward v. Commonwealth*, 695 S.W.2d 404, 407 (Ky.1985).

was left with the impression that its "awesome responsibility" rested elsewhere.

Consequently, the petitioner did not have his constitutional rights violated because the prosecutor and the trial judge merely reiterated the proper procedure involved under Kentucky law and the petitioner has failed to show that the jury was induced to disregard its responsibility.

The Supreme Court of the United States has itself used the word "recommendation" to describe the role of the jury in the Kentucky procedure. *Buchanan v. Kentucky,* — U.S. —, 107 S.Ct. 2906, 2912 n. 15, 97 L.Ed.2d 336 (1987). Therefore, this court is in agreement with the Kentucky Supreme Court that use of the word "recommendation" in this instance was not error.

### ISSUES III AND IV—Whether admission of petitioner's confession constitutes reversible error.

Following his arrest and interrogation on January 6, 1980, Kordenbrock confessed to the robbery of the Western Auto store in Florence, Kentucky, and to the shooting of the two store clerks in the course of the robbery (Allen and Thompson). Allen was killed but Thompson survived as an eye witness.

On April 29, 1981, Kordenbrock filed a motion and memorandum asking the Boone County Circuit Court to suppress his confession, contending that he had attempted on three occasions during the police interrogation to cut off questioning but that it had continued in violation of his rights under *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and *Michigan v. Mosley,* 423 U.S. 96, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975).

Following an evidentiary hearing on Kordenbrock's motion, the trial judge refused to suppress the confession, finding *inter alia,* that Kordenbrock had not been under the influence of drugs or alcohol at the time and that he had demonstrated a willingness to confess.

In its opening statement at trial, the Commonwealth informed the jury that Kordenbrock had been interrogated and that he had confessed to the robbery/murder. Immediately thereafter, Kordenbrock personally gave an opening statement in which he admitted his participation in the robbery and his shooting of the two store clerks explaining that he had been "all messed up" from liquor and quaaludes he had ingested during the previous night and on the morning of the robbery. He further stated that he did not know why he had shot the clerk but now deeply regretted his act. He did not testify again at trial.

Immediately prior to the trial, petitioner's counsel had stated for the record:

"[P]ursuant to your overruling our pretrial motions, our position has been limited and we ... are ... still maintaining the incorrectness of your rulings on our pretrial motions and the position we have taken today in no way is a waiver of those positions we had taken prior to this trial actually commencing."

T.E. Vol. XXVI 3764-65.

Petitioner's opening statement in its entirety was as follows:

"By Mr. Kordenbrock

"Good morning, ladies and gentlemen, Once again, I would like to introduce myself. My name is Paul Kordenbrock. Please let me thank you for your patience and attention during this jury selection. I am pretty nervous being up here so if I make a mistake, please forgive me in correcting myself. In fact, I wrote this down and am reading it because I am nervous and don't want to forget anything.

"I would like to show you what the evidence will show happened on January 5, 1980. The evidence will show that I woke up that morning around 8:15. While getting dressed I was feeling pretty hungover from a party the night before. I immediately ate a 714, which is a street name for a Qualude [sic]. We arose so early that morning because Karen's Mom was coming over to help her clean the apartment and Mike and Karen weren't getting along at the present time so we decided to leave before her mother arrived. After getting dressed I entered

the kitchen where the girls were having their morning coffee and discussing what their day consisted of. I reached for a beer and Mike joined me. We all agreed it was a good party we had attended the night before.

"While talking to Mike, Mike and myself decided to finish off the six pack in the refrigerator and head for Kentucky to look up Richard Fehler and try to wheel and deal with him concerning this cassette tape deck he mentioned he might want to sell. Reaching for another beer I grabbed all four of them and asked Mike if he felt like shotgunning them. After the first one I reached into my pocket and pulled out a bottle of 714s, which are street names for Qualudes [sic]. I gave Mike one' and took one myself and then I asked the girls if they wanted one. Two of them excepted [sic]. Then we shotgunned the remaining beers and said we would see the girls later.

"While crossing the I–75 bridge we decided to grab a sandwich and we got off at the 5th Street exit, stopped and both ate a Ham and Cheese sandwich. I asked Mike if he thought his friend would trade some 714's for some pot I had. Mike said that we needed some gas and could ask him while filling up at the Workingman's gas station up here on this exit. While filling the tank we also bought ten Qualudes [sic]. We both ate two and headed out. While buying an ax the prior Thursday we saw a couple of Cole Python Pistols. We were purchasing the ax to split fire wood at my camp on Eagle Creek. After pulling out Mike said, 'let's go get the guns, we can sell them and get some more drugs.' After parking the car I reached under the seat and grabbed a gun. When we entered the store I approached Mr. Thompson and asked him to go to the back. When we got to where Mr. Allen was I told them to lie down and then a customer came in and I told Mike to get rid of him. I was standing there all messed up from the night before and what I had already consumed that morning. At that time I heard the crashing of glass and I am not

sure what caused my next movements, but I shot both men. Then I ran to the front of the store and Mike had the guns and we left. I never intended to shoot anybody. It just happened. I ran around the next day and a half trying to sell the guns. I got arrested the next Sunday night and told them I did it and it is something that I have been living with for the past eighteen months and twenty-six days. I don't know how to put it in words how I feel.

"Thank you."

T.E. Vol. XXVI 3760–63.

In his closing argument on the guilt phase, petitioner's counsel stated:

"There can be no doubt in your minds that Paul robbed the Western Auto Store. There can be no doubt in your mind that Paul shot Bill Thompson. There can be no doubt in your mind that Paul killed Stanley Allen, cause that is what the evidence has been. Paul pled guilty to the robbery and he told the Judge that he was guilty of that. And Paul, when he was arrested on Sunday evening confessed to the people who arrested him and he told them that he did it. And a few days ago Paul sat in this chair and told you what the evidence would be. And he told you that the evidence would be that he robbed the Western Auto Store, that he shot Bill Thompson, and that he killed Stanley Allen. He has never denied doing that. T.E. Vol. XXX 4429.

\* \* \* \* \* \*

"And it is your job to fit the facts of this case into which instruction, because there is no doubt that the acts were committed by Paul. The question is, how will you punish him?"

T.E. Vol. XXX 4432.

After the jury returned the guilty verdict, petitioner's counsel and witnesses several times referred to petitioner's willingness to confess as a mitigating factor. For example, Mr. Monohan said in argument out of the hearing of the jury:

"This is a mitigating factor. Because his position all along has been that he

will plead guilty and admit guilt to murder if sentence is life imprisonment. This jury has a right to know that he has not intended otherwise, and they have a right to factor that into their determination."

T.E. Vol. XXXI 4648.

And petitioner's witness, Reverend Feamster, stated:

"Yes, bibically, [sic] of course, confession is a crucial part in our own process of redemption and Paul has confessed to God, to me, and to others and to his family what he has done and he is sorry for that. He would like to have a chance to try to make up for that and to try and develop his life in a way—and that is what we talk about bibically [sic] when we speak of redemption."

T.E. Vol. 4684.

The issues presented to the court with regard to the admissibility of petitioner's confession are:

(1) Was the confession the result of unconstitutional coercion on the part of the police?

(2) Was the confession obtained in violation of the *Miranda* procedures?

(3) If *Miranda* procedures were violated, was the admission of the confession harmless error?

(4) Alternatively, did petitioner waive any such violation by using the confession affirmatively in his opening statement and as a mitigating factor in the sentencing phase of the murder trial?

### 1. Coercion

■ Whether or not petitioner's confession was a product of coercion is an issue of fact. The state courts found that it was not. This court has made its own independent review of the record, including a careful reading of the entire transcript of the interview which terminated in the confession. At no time was petitioner's will overborne, he was cogent and vigorous throughout the interview. He negotiated and bargained with the police regarding protecting certain female friends of his who might be implicated. Therefore, the court holds that the confession was not obtained by coercion. For cases providing general standards for determining coercion, *see e.g., Rogers v. Richmond,* 365 U.S. 534, 81 S.Ct. 735, 5 L.Ed.2d 760 (1961); *United States v. Murphy,* 763 F.2d 202 (6th Cir.1985); *United States v. Brown,* 557 F.2d 541 (6th Cir.1977).

### 2. Miranda.

■ Based on the court's careful study of the transcript, however, the court can only conclude that the confession was obtained in violation of petitioner's rights under the doctrine of *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and its progeny.

This conclusion is based on the fact that several times during the interview petitioner asked that it be stopped and resumed the next day. He repeated several times, "I can't tell you no more tonight," or words to that effect. One of the officers admitted in his testimony before this court that the interrogators interpreted this as a desire on the part of the petitioner to quit, but they pressed on, because they wanted to get the matter wrapped up that night.

Of course, part of the *Miranda* panoply of rights is the right to have an in-custody interview terminated for any reason. This right was not respected by the police here. Although petitioner made many damaging statements prior to his first request for an adjournment of the interview, it was his final written statement given at the conclusion of it that was admitted at the trial.

*Martin v. Wainwright,* 770 F.2d 918 (11th Cir.1985) (modified on other grounds, 781 F.2d 185 (11th Cir.1986)), is directly in point on this issue and reference is made to that opinion for further discussion of the precedents involved.

The court holds further, however, that the admission of this statement was harmless error or, in the alternative, that any error was waived by petitioner.

### 3. Harmless Error.

■ As has been stated, petitioner delivered his own opening statement at the trial

at which time he reiterated his confession to having been one of the robbers of the store and to being the one who shot the two clerks. In the opening statement he denied knowing why he had shot the two men. This was part of a strategy to lay the basis for an argument to be made later by his attorneys that he lacked the intent to commit murder because he was under the influence of drugs. It was also part of the defense strategy to appeal to the sympathy of the jury by having petitioner express his regret for his acts in the opening statement. This strategy was further pursued by his able counsel by having petitioner plead guilty to the robbery later in the proceedings, and by arguing during the penalty phase after conviction that petitioner had resolved to mend his ways and reform his life, as evidenced in part by his forthright confession.

Obviously, the reiteration of the confession in the opening statement was completely voluntary and made only after petitioner was fully advised of his rights by his own trial counsel. Indeed, no claim is made to the contrary.

Petitioner argues, however, that his affirmative use of his confession in his attempt to play upon the sympathies of the jury does not constitute a waiver of the *Miranda* violation discussed above or render it harmless error.

The court holds, however, that the decision of the Supreme Court of the United States in *Oregon v. Elstad,* 470 U.S. 298, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985), is fatal to this position.

In *Elstad,* the Court held that where, as here, a first confession had been the result of a *Miranda* violation but was followed by a second valid confession, the second confession was admissible. The Supreme Court in *Elstad* rejected the same arguments made by the petitioner here, namely, that the second confession was tainted because it was "the fruit of the poisonous tree" or resulted from having "let the cat out of the bag." The Court held that these doctrines applied only to confessions which resulted from prior COERCED confessions.

Here, of course, the issue is not whether the second confession made in open court was admissible. Since making it was an essential part of the defense strategy, it would have been improper to have excluded it. The issue here is whether the admission of the first confession was harmless error in light of petitioner's deliberate, fully counselled, affirmative use of his confession at trial.

Directly on point is the case relied on by petitioner to establish the *Miranda* violation in the first place: *Martin v. Wainwright, supra,* 770 F.2d at 932. There, the court held that the admission of a prior confession obtained in violation of the *Miranda* rule was harmless error in the light of the admission of a second, properly obtained confession and other evidence. The rationale of the court is highly pertinent to the matter under discussion:

"**G. Harmless Error**

"To summarize, the July 4 confession, although voluntary, was obtained in violation of *Miranda* and hence inadmissible. Under *Elstad,* however, neither the July 4 *Miranda* violation nor the fact that Martin had 'let the cat out of the bag' rendered the July 11 confession inadmissible. Rather, the July 11 confession, having been obtained without coercion and in full compliance with both *Miranda* and the Sixth Amendment right to counsel, properly was admitted at trial. We now must determine whether Martin is entitled to reversal of his murder conviction, or whether the erroneous admission of the July 4 confession was "harmless error" under the test set forth in *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).

"After reviewing the entire record, we are convinced beyond a reasonable doubt that the erroneous admission of Martin's July 4 confession could not have contributed to his murder conviction. The most important factor in our decision is that the July 4 confession was merely cumulative of the evidence contained in the July 11 confession. In fact, the July 11 confession included a far more detailed description of the murder than did the July 4 confession.

"Moreover, in addition to the July 11 confession, the jury had before it the testimony of Martin's accomplice, Gary Forbes, who gave a lengthy account of the robbery, kidnapping, and sexual battery of Patricia Greenfield, and who told the jury how Martin, armed with a knife, led the blindfolded young woman down a dirt road at the Lantana Dump and returned fifteen or twenty minutes later, saying that he had killed Greenfield by stabbing her in the throat. Finally, the jury was presented with the unrebutted testimony of a state pathologist, who examined Greenfield's body and found the cause of her death to be the multiple stab wounds in the throat."

*Id.* at 932–33.

It has been stated recently that "[w]here a subsequent confession is obtained constitutionally, the admission of prior inadmissible confessions may constitute harmless error." *United States v. Johnson,* 816 F.2d 918, 923 (3d Cir.1987) (*citing Bryant v. Vose,* 785 F.2d 364 (1st Cir.1986) *United States v. Packer,* 730 F.2d 1151 (8th Cir.1984). Here, as in the cases cited, the original confession was merely cumulative of the in-court statement by petitioner, the effect of which was enhanced by his plea of guilty to the robbery of which the jury was advised with his consent. T.E. Vol. XXX 4429.

Also on point is *Burks v. Perini,* No. 85–3507 (6th Cir. Nov. 25, 1986) (Westlaw) [810 F.2d 199 (table)], an unpublished decision of the United States Court of Appeals for the Sixth Circuit. In that decision the admission of a confession improperly obtained under *Miranda* was held to be harmless error where there was a second proper confession, the defendant took the stand and testified ineffectively to self defense, and there was other strong evidence of his guilt. *Id.*

The general rule was well stated in *People v. Auilar,* 59 Ill.2d 95, 319 N.E.2d 514 (1974):

"Though courts have not been unanimous in their reasoning, it generally has been held that if a defendant takes the witness stand and admits in substance matters contained in a confession or statement he has given the police, this testimony will be considered to have waived or made harmless any error that may have occurred in the admission of the confession or statement."

In determining whether there was harmless error in the admission of inadmissible evidence, the court looks "to the record for independent evidence of guilt, including in court admissions by ... [defendant] himself." *Smith v. Estelle,* 519 F.2d 1267, 1271 (5th Cir.1975). *Cf. Milton v. Wainwright,* 407 U.S. 371, 92 S.Ct. 2174, 33 L.Ed.2d 1 (1972); *United States v. Hamilton,* 689 F.2d 1262, 1274 (6th Cir.1982); *Sweeney v. United States,* 408 F.2d 121 (9th Cir.1969); *Rock v. Zimmerman,* 543 F.Supp. 179 (M.D.Pa.1982). *See generally* cases cited in 31 West's Federal Practice Digest 3d *Criminal Law* 337–39 (Key No. 1169.3).

Petitioner relies on *Harrison v. United States,* 392 U.S. 219, 88 S.Ct. 2008, 20 L.Ed.2d 1047 (1968). There three improperly obtained confessions were introduced at defendant's murder trial. In an attempt to avoid the effect of these confessions defendant took the stand and admitted to being present at the scene of the shooting but claimed it was an accident. After conviction and appeal, the decision was reversed by reason of admission of the improperly obtained confessions. On the second trial, the defendant did not take the stand, but the prosecution introduced a portion of his testimony from the previous trial. The Court held on appeal from the second conviction that defendant's testimony at the former trial was inadmissible at the second trial because it was the fruit of the illegally procured confession.

It is doubtful whether the Supreme Court would decide *Harrison* the same way today. Its rationale is inconsistent with that of *Elstad, supra,* although the *Elstad* opinion does make an oblique reference to *Harrison.* 105 S.Ct. at 1297. Indeed, one respected district judge has held that *Elstad* implicitly overruled *Harrison. United States ex rel. Perri v. Director, D.O.C. State of Ill.,* No. 83 C 1439 (N.D.Ill.

Sept. 16, 1985) (Westlaw [1985 WL 2591]) (Nordberg, J.). The court finds Judge Nordberg's reasoning to be fully applicable here. In *Perri*, both the Illinois state courts on appeal and Judge Nordberg held that a defendant who voluntarily takes the stand and reiterates a previous confession, as did the petitioner here, voluntarily waived any *Miranda* defects in the first confession, or rendered its admission harmless error. The Seventh Circuit affirmed the denial of habeas relief on other grounds. *Perri v. Director, Dept. of Corrections of Illinois*, 817 F.2d 448 (7th Cir. 1987).

This court holds that *Harrison*, if it retains any viability, is limited to its facts. In any event, *Harrison* is not applicable here. In *Harrison*, the defendant took the stand in order to give a version of the facts at variance with his confession; that is, to attempt to avoid its effect as an admission of culpability. Here, petitioner made his statement in open court completely adopting his confession and attempting to use it to his advantage to curry favor with the jury for his forthrightness. His spirit of cooperation and contrition was emphasized over and over. He made affirmative use of the confession rather than lying to talk his way around it. The strategy was pursued further in the sentencing phase. The court holds on the basis of its careful review of the entire transcript of the trial that this was a deliberate defense strategy. The court finds that this strategy was petitioner's only hope to avoid conviction of murder and the death sentence and would have been pursued even if the original confession had been suppressed. Thus, this case is identical in this respect with the decision of the Sixth Circuit in *Burks, supra*, where the court held:

> "... the government's use of Burks' involuntary statement did not induce him to testify on his own behalf and ... the trial court's decision to admit his confession, although erroneous under the circumstances, constituted harmless error."

*Burks*, No. 85–3507 (6th Cir. Nov. 25, 1986) (Westlaw) [810 F.2d 199 (table)].

*Cf. Oregon v. Elstad*, 105 S.Ct. at 1297, where the Court makes clear that *Harrison* must be limited to those situations where the admission of an improperly obtained confession *induces* defendant to testify in rebuttal. Here the motivation of petitioner's making a statement in open court was his desire to use the confession in mitigation.

Other evidence against petitioner, including the testimony of his accomplice, was overwhelming. Therefore, the court holds that the admission of the confession was harmless error beyond a reasonable doubt.

*4. Waiver.*

■ Further, the court holds alternatively that there was a deliberate waiver of any *Miranda* violation. The petitioner went far beyond a mere attempt to explain away the original confession. Rather, as has been stated, he made affirmative use of it to elicit the jury's sympathy in the hope that it would not find him guilty of murder. Petitioner emphasized the voluntariness again in the penalty phase as evidence of his contrition and firm purpose of amendment. Even though this is a death penalty case, surely petitioner cannot be permitted to attack the confession in chambers while invoking it in his defense before the jury. Even in a death penalty case, a litigant should not be permitted such a flamboyant pursuit of inconsistent positions. This court holds that such efforts constitute a deliberate and knowing waiver of any infirmity in the original confession. *Cf. McMann v. Richardson*, 397 U.S. 759, 90 S.Ct. 1441, 25 L.Ed.2d 763 (1970) (guilty plea); *United States v. Higuchi*, 437 F.2d 835, 837 (9th Cir.1971); *People v. Auilar*, 59 Ill.2d 95, 319 N.E.2d 514 (1974).

The state cases relied on by petitioner, *see e.g., Hawthorne v. State*, Fla.App., 377 So.2d 780 (1979), *Hall v. State*, 255 Ind. 606, 266 N.E.2d 16 (1971), *Ware v. State*, Fla.App., 307 So.2d 255 (1975), *People v. Freeman*, 668 P.2d 1371 (Colo.1983), are distinguishable because of petitioner's affirmative use of the confession. The state cases involved endeavors to negate the effects of confessions such as attempts to

explain away possession of property, evidence of which had been obtained by wrongful searches.

### ISSUE V—Was the destruction of evidence constitutional error?

█ Petitioner's fifth contention of error is that he was denied his Fifth, Sixth, Eighth, and Fourteenth Amendment rights when law enforcement officers intentionally erased a taped recording of his interrogation. Petitioner asserts that the tapes were erased intentionally and that such action precludes him from making a Fifth Amendment attack on the written confession introduced against him. Petitioner admitted that the transcript made from the recording was accurate. Yet, he asserts that the inflections and tone of the interrogations are forever lost and thus fact precludes him from making a meaningful attack on the written confession introduced against him. Furthermore, the absence of the tapes, argues petitioner, undermines that "greater degree of reliability" which is required during both the finding of guilt and the assessing of punishment in a capital case.

Petitioner's fifth contention of error is without merit. First, Kentucky law mandates that law enforcement officials retain evidence such as tape recordings of confessions only when requested by defense counsel. Before such request is made, a police department has the right to do as it wishes with such evidence, although the Kentucky Supreme Court strongly urges the retention of such evidence. *Hendley v. Commonwealth*, 573 S.W.2d 662, 667 (Ky. 1978). In the case at hand, the recording of the confession was erased before defense counsel's request.

Second, the destruction of the tape does not prevent the petitioner from forming a meaningful defense against the crime charged as is constitutionally guaranteed. *See Crane v. Kentucky,* 476 U.S. 683, 106 S.Ct. 2142, 90 L.Ed.2d 636 (1986); *California v. Trombetta*, 467 U.S. 479, 104 S.Ct. 2528, 81 L.Ed.2d 413 (1984). Petitioner's reliance on *Crane, supra,* in support of his argument that he could not present a meaningful defense without the tape recording of the confession is unfounded. In *Crane,* the defendant was prevented from introducing any evidence regarding the circumstances surrounding his confession after a pretrial ruling declared such confession to be voluntary. *Crane,* 106 S.Ct. at 2144. The *Crane* Court held that the exclusion of this evidence denied the defendant a fair trial because evidence about the circumstances surrounding the taking of a confession are relevant to its reliability. In contrast, the petitioner in the case at hand had the opportunity to challenge the confession before the jury. T.E. Vol. XXVII 3975–3981 and Vol. XXIX 4314–4322. Furthermore, petitioner himself testified that the transcript of the interrogation was accurate. T.E. Vol. XXV 3557, 3587–88.

Furthermore, as to the State's duty to preserve evidence, the United States Supreme Court noted in *California v. Trombetta:*

"[T]hat duty must be limited to evidence that might play a significant role in the suspect's defense. To meet this standard of constitutional materiality, ... evidence must both possess an exculpatory value that was apparent before the evidence was destroyed, and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means."

467 U.S. 479, 488–89, 104 S.Ct. 2528, 2534, 81 L.Ed.2d 413 (1984) (citations omitted). *See also, Elmore v. Foltz,* 768 F.2d 773 (6th Cir.1985) (destruction of tapes of conversations between state prisoner and informant did not violate due process).

Clearly, the *Trombetta* test is not met in the case at hand. Petitioner's confession was transcribed and hence, available in permanent form even though the tape was erased. It is true that the inflections and tones of the confession are irretrievably lost, but the petitioner himself lessens any suspicions concerning the propriety of the interrogation when he testified that the transcript was an accurate reflection of the interrogation. Furthermore, when the police officers erased the tape, it was not evident that the tape would possess any

exculpatory value because the confession had been accurately transcribed. Clearly, petitioner's own admission of the accuracy of the transcript should preclude his raising this particular contention of error.

### ISSUE VI—Alleged police misconduct concerning photo display and vial of drugs.

Petitioner's sixth contention of error is that he was denied his Sixth, Eighth and Fourteenth Amendment rights as a result of certain actions of law enforcement officers. Petitioner contends that he was deprived of his constitutional rights by two different actions of police. First, petitioner notes that due to improper police conduct, he was not given the opportunity to view and to spread before the jury the photo display that had been shown to the surviving victim between 3:00 and 3:30 a.m. on January 6, 1980, the morning after the murder. The surviving victim was awakened in his hospital bed from a very sedated sleep and was informed by police officers that they wanted him to look at some photos to see if he could identify anyone. The police officers stayed approximately 45 minutes attempting to get Thompson, the surviving victim, to identify petitioner from the photo display. Thompson did not identify petitioner at that time. Thompson did identify the petitioner at a lineup on February 1, 1980.

Petitioner contends that the array was set up in such a way as to emphasize the picture of petitioner from the display. The photo array contained six photos, all of these being mug shots except that of petitioner, which was an ordinary snapshot. The police officers destroyed the photo display. Hence, petitioner concludes that he cannot make a meaningful showing that there was a substantial likelihood of irreparable misidentification in this case in that the photo array tainted the lineup identification almost one month later. Petitioner asserts that he was prevented from presenting a meaningful defense to the jury.

Second, petitioner contends that he was prevented from presenting a meaningful defense to the charge against him because of the police officers' failure to retain a vial of drugs that was found in a woman's possession who was arrested at the same time as petitioner. Petitioner argues that his strongest defense was based on his lack of capacity to understand what he was doing due to the ingestion of drugs. Further, petitioner contends that his will was easily overborn during interrogation due to his ingestion of drugs.

Petitioner asserts that the bottle of pills was placed between him and the interrogators during the entire interrogation. Major Stamper, an interrogating officer, admitted this but also stated that he did not know what kind of pills they were, nor did he know what happened to the pills after the interrogation. Major Stamper contends that he was not under the impression that the pills came from petitioner, otherwise they would have been kept and analyzed. Transcript of Evidentiary Hearing (hereinafter T.E.H.) at 29–30 (Oct. 15, 1987).

Petitioner argues that without this bottle of pills he had no chance to present the meaningful defense of demonstrating a coerced confession because he was denied the opportunity to have the pills analyzed to show their effect on him.

■ Petitioner's sixth contention of error is not sufficient grounds to grant his habeas petition. Due process is violated if an identification procedure is so suggestive that it creates a "very substantial likelihood of irreparable misidentification." *Simmons v. United States,* 390 U.S. 377, 384, 88 S.Ct. 967, 971, 19 L.Ed.2d 1247 (1968). The determination of whether an identification procedure under the totality of the circumstances is reliable *even though* suggestive, however, was set out by the United States Supreme Court in *Neil v. Biggers,* 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972). In *Neil,* the Court noted that five factors should be considered in evaluating the likelihood of misidentification in confrontation procedures that may be considered suggestive:

1. The opportunity of the witness to view the criminal at the time of the crime;

2. The witness' degree of attention;

3. The accuracy of the witness' prior description of the criminal;

4. The level of certainty demonstrated by the witness at the confrontation;

5. The length of time between the crime and the confrontation.

*Neil,* 409 U.S. at 199–200, 93 S.Ct. at 382. *See also Thigpen v. Cory,* 804 F.2d 893 (6th Cir.1986) (identification procedure so suggestive as to deny due process); *Owens v. Foltz,* 797 F.2d 294, 295–96 (6th Cir.1986) (identification procedure not so suggestive as to deny due process).

In applying these factors to the case at hand, it is clear that although arguably suggestive, the photo array did not result in a "very substantial likelihood of irreparable misidentification." First, Mr. Thompson testified that *he saw petitioner for approximately one minute* when petitioner entered the Western Auto Store. T.E. Vol. XXV 3710. Petitioner told Mr. Thompson at that time to "get to the back of the store," at which time Mr. Thompson hesitated while taking in the situation. *Id.* at 3711. Although Mr. Thompson's back was to the petitioner for the rest of the incident, Mr. Thompson testified that he knew petitioner when he was first confronted because petitioner "had been in the store on the Thursday and Friday previous to this Saturday" so Mr. Thompson was "fairly familiar with [petitioner's] appearance." *Id.* at 3713. Petitioner's prior two visits to the store had each lasted approximately twenty to thirty minutes. Mr. Thompson therefore had a substantial opportunity to observe petitioner.

Second, Mr. Thompson demonstrated a good degree of attention. Officer John Baker interviewed Mr. Thompson beginning about 10:30 a.m. after the 9:30 a.m. shooting. *Id.* at 3672. Although Mr. Thompson was in the hospital at the time being treated for his gunshot wound, Officer Baker was surprised at his alertness and coherence. *Id.* at 3677–3678. Mr. Thompson's description of the assailant was direct and Officer Baker felt that Mr. Thompson was "relatively sure." *Id.* at 3678.

Third, Mr. Thompson's description was accurate. He told Officer Baker that the assailant looked like Kenny Rogers: light brown hair over his ears, full beard and moustache, and brown eyes. T.E. Vol. XXV 3677. He also assisted in the preparation of a composite later that same day. *Id.* at 3684 (Suppression Hearing Exhibit: Defense Exhibit No. 12).

Fourth, Mr. Thompson demonstrated certainty at the confrontation with petitioner. On February 1, 1984, Mr. Thompson attended a lineup during which there was no indication that any suspect was present. *Id.* at 3701–02. He first identified co-defendant Mike Kruse out of the six-man lineup and then identified petitioner as the one who did the shooting. *Id.* at 3644, 3647. Mr. Thompson testified that he was slow to identify petitioner because petitioner was groomed differently and the lighting was poor. *Id.* at 3705. He told Major Stamper that he hesitated on petitioner because "he wanted to make sure." *Id.* at 3648.

Fifth, the crime occurred on the morning of January 5, 1980. Mr. Thompson outlined a description and a composite that same day. The lineup occurred on February 1, 1980. The length of time between the crime and the confrontation was sufficiently short to guarantee reliability.

■ Further, the destruction of the photo array did not prevent petitioner from presenting a meaningful defense. In *California v. Trombetta,* 467 U.S. 479, 104 S.Ct. 2528, 2530, 81 L.Ed.2d 413 (1984), the United States Supreme Court commented upon a State's duty to preserve evidence where California law enforcement agencies were destroying breath samples of suspected drunk drivers after the results of the breath-analysis test were recorded. The defendants in *Trombetta* contended that the destruction of the samples prevented them from impeaching the incriminating intoxilyzer results and consequently, the results of these tests were not admissible into evidence. *Id.* at 482–83, 104 S.Ct. at 2530–31. The United States Supreme Court noted that California's policy of not preserving breath samples was without

constitutional defect. The Court then commented on the extent of a state's duty to preserve evidence:

"[T]hat duty must be limited to evidence that might be expected to play a significant role in the suspect's defense. To meet this standard of constitutional materiality, ... evidence must both possess an exculpatory value that was apparent before the evidence was destroyed, and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means."

*Id.* at 488–89, 104 S.Ct. at 2534 (citations omitted). *See also Elmore v. Foltz,* 768 F.2d 773 (6th Cir.1985) (destruction of tapes of conversations between state prisoner and informant did not violate due process).

Likewise, in the case at hand, the officials' destruction of the photo array is without constitutional error. Petitioner had the opportunity at trial to cross-examine Thompson concerning his viewing of the photo array and his eventual identification of the petitioner from the lineup. Consequently, other means were available to show the impropriety, if any, in the circumstances surrounding the photo display. Certainly, at the time of the photo display where no identification of the perpetrator was made, officials could hardly anticipate that the display would play a role in the suspect's defense. This is especially true concerning the issue of undue suggestiveness resulting in a "very substantial likelihood of irreparable misidentification."

■ The *Trombetta* analysis as applied to the petitioner's contention of error regarding the preservation of the bottle of pills also operates to crush petitioner's arguments. First, it was not apparent at the time of the disappearance of the pills that they would play a significant role in petitioner's defense because the police officers were under no impression that the pills had come from the petitioner:

1. Major Stamper had testified at a suppression hearing that the pills were not taken from the petitioner, but from Abigail Smith. T.E. Vol. XXIII 3392–93.

2. Petitioner denied this, and a hearing was held to determine the pills' origin. T.E. Vol. XXIV 3552.

3. Major Stamper again testified that only a buck knife and petitioner's driver's license were taken from Kordenbrock at the time of the arrest. T.E.H. at 23 (Oct. 15, 1987).

4. Petitioner testified that he bought some quaaludes at a gas station right before the offense in question and again the next day from Joey Reinhart and that petitioner took four or five of the pills before being arrested. T.E.H. at 138, 141–43 (Sept. 23, 1987).

5. Joey Reinhart denied seeing petitioner on the Sunday petitioner claims to have bought the pills. T.E.H. at 15 (Oct. 15, 1987).

Consequently, it was not apparent to the officials that the pills belonging to Ms. Smith would be relevant to the defense of petitioner and hence, no effort was made to preserve them. Major Stamper testified that if he knew the drugs were relevant to petitioner they would have been kept and analyzed. *Id.* at 29–30.

Furthermore, petitioner was able to present a meaningful defense without the presence of the drugs and was able to present comparable evidence as to their effect on him if he had in fact ingested them. *See Crane v. Kentucky,* 476 U.S. 683, 106 S.Ct. 2142, 90 L.Ed.2d 636 (1986); *California v. Trombetta,* 467 U.S. 479, 104 S.Ct. 2528, 81 L.Ed.2d 413 (1984). Petitioner presented testimony of a Dr. Nelson at trial who testified to the effect of quaaludes on behavior. The expert testified as to all types of quaaludes, especially street quaaludes. T.E. Vol. XXIX 4203–4204. Dr. Nelson's testimony comprises over 200 pages of the trial transcript and demonstrates that petitioner had ample opportunity to present a defense to this issue although the jury chose to reject such testimony. *See Id.* at 4199–4311.

■ Further, the court holds that if any errors were committed by the trial court with regard to the matters discussed herein they constituted harmless error or were waived by petitioner's defense strategy of

admitting the shooting, pleading guilty to the robbery and throwing himself on the mercy of the court and jury. Consequently, petitioner's sixth contention of error is without merit.

### ISSUE VII—Should the trial judge have granted petitioner's motion for a change of venue?

■ Petitioner's seventh contention of error is that he was denied his Sixth, Eighth and Fourteenth Amendment rights when the trial judge denied petitioner's motion for a change of venue or alternate remedies to a change of venue.

Petitioner moved the trial court for a change of venue from Boone County to Mason County or, in the alternative, for further funds to put on better proof before the court as to why a change of venue was necessary in this case. T.E. Vol. VI 766–900, Vol. VII 901–918. The petitioner put on evidence that many people in Boone County had already formed opinions as to the guilt of petitioner as a result of news accounts, radio broadcasts and television broadcasts. Transcripts of the various forms of publicity were submitted into evidence as well as a public opinion poll survey and affidavits.

Judge Neace denied the motions stating that he did not find actual prejudice. T.E. Vol. VII 914. The Judge noted that he would attempt to monitor this issue during *voir dire* and if it became apparent that there was actual prejudice, he would change the venue at that time. *Id.* The trial judge noted that a great deal of publicity had occurred in January 1980 and it then being June 1981, he felt that enough time had passed to have neutralized a great deal of the publicity in the case. *Id.* at 915–16.

With the United States Supreme Court case of *Irvin v. Dowd,* 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961), the case law concerning a criminal defendant's right to a fair trial in the face of pervasive media coverage began to evolve. In *Irvin,* intense media publicity concerning the crimes charged infiltrated the rural community immediately before trial. The publicity concerned the defendant's prior convictions and his confession to twenty-four burglaries and six murders including the murder then at issue. Consequently, eight of the twelve jurors held pretrial opinions that the defendant was guilty and the others went "so far as to say that it would take evidence to overcome their belief" in his guilt. 366 U.S. at 728, 81 S.Ct. at 1645. The Court held that actual prejudice against the petitioner rendered a fair trial impossible. *Id.*

Two years later in *Rideau v. Louisiana,* the Court noted that prejudice was presumed in that case because the influence of the news media pervaded the proceedings. 373 U.S. 723, 726–27, 83 S.Ct. 1417, 1419–20, 10 L.Ed.2d 663 (1963). There, a twenty minute film of defendant's confession under police interrogation to a murder charge was broadcast three times in the community where the defendant was to be tried. The Court did not even bother to examine the *voir dire* to determine the existence of prejudice in this case in that it believed that the trial was but a formality to the real trial that had occurred when the community viewed the confession on camera. 373 U.S. at 726, 83 S.Ct. at 1419. *See also Estes v. Texas,* 381 U.S. 532, 85 S.Ct. 1628, 14 L.Ed.2d 543 (1965) (trial conducted in circus atmosphere where press permitted to sit within bar of the court and overrun it with television equipment); *Sheppard v. Maxwell,* 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966) (trial infected with extreme publicity and carnival-like atmosphere).

The Court set out particulars as to what constitutes a panel of fair and impartial jurors in the face of media publicity in *Murphy v. Florida,* 421 U.S. 794, 95 S.Ct. 2031, 44 L.Ed.2d 589 (1975). The Court noted that a juror need not be totally ignorant of the facts of the case before it. " 'To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. It is sufficient if the juror can lay aside his

impression or opinion and render a verdict based on the evidence presented in court.'"

*Murphy,* 421 U.S. at 800, 95 S.Ct. at 2036 (quoting *Irvin v. Dowd,* 366 U.S. at 723, 81 S.Ct. at 1642–43).

If the juror states that such opinion can be put aside, the defendant must demonstrate "the actual existence of such an opinion in the mind of the juror as will raise the presumption of partiality." 421 U.S. at 800, 95 S.Ct. at 2036. Under the standards set out in its opinion, the Court found that the petitioner had not shown that the trial was inherently prejudicial or that the jury selection process permitted "an inference of actual prejudice." 421 U.S. at 803, 95 S.Ct. at 2038.

The Court looked to the totality of the circumstances to determine if the trial was fundamentally fair. The Court considered the lapse in publicity before trial and how that probably eased public opinion. The Court also considered the content of the media reports to determine whether they were merely factual in nature or inflammatory. *Id.* at 802, 95 S.Ct. at 2037. Another relevant factor considered by the Court was the length to which the trial court must go to select impartial jurors. For example, if most veniremen admit to a disqualifying prejudice, those who claim they can be impartial may be seriously questioned because evidence exists of a community with deeply rooted prejudice. *Id.* at 802–803, 95 S.Ct. at 2037.

More recently in *Patton v. Yount,* the United States Supreme Court considered the above noted factors and held that the trial court did not err in finding that the jury as a whole was impartial. 467 U.S. 1025, 104 S.Ct. 2885, 2893, 81 L.Ed.2d 847 (1984). The Court noted that the passage of time between the first and second trial rebutted any presumption of partiality or prejudice that existed at the time of the initial trial. The Court considered the amount of publicity and stated that it did not amount to a "huge wave of public passion." *Id.,* 104 S.Ct. at 2889–90. Most importantly, the Court noted that it is a question of historical fact as to whether a juror swore he was impartial and whether his or her oath could be be believed. Consequently, the trial court's findings in this regard are to be awarded the statutory presumption of correctness pursuant to 28 U.S.C. § 2254(d).

As to this factor, the Court noted that there was fair support in the trial court record that the juror would be impartial and any ambiguity in the testimony of certain jurors who were challenged for cause was insufficient to overcome the presumption of correctness owed to the trial court's findings. The Supreme Court noted that great deference must be given to the trial judge who heard the *voir dire* and who could observe the demeanor of the veniremen. *Id.* at 2891–93. *See also Brofford v. Marshall,* 751 F.2d 845 (6th Cir.1985) (no evidence presented to overcome trial judge's finding of juror impartiality); *Aldridge v. Marshall,* 765 F.2d 63 (6th Cir. 1985) (federal court intervention into factual finding of trial judge concerning pretrial publicity will be had in only extraordinary cases because of statutory presumption of correctness).

In petitioner's case, as noted above, a hearing on petitioner's motion for a change of venue was held on June 6, 1981. T.E. Vol. VI 766–900, Vol. VII 901–18. Newspaper clippings, transcripts of television and radio broadcasts and video tapes were introduced. Most of this evidence was published or broadcast in early January 1980, immediately after the crime. T.E. Vol. VI 795–96. The affidavit of media contact expert Noble was introduced. *Id.* at 817–19. Mr. Noble's examination of the newspaper clippings, transcripts and tapes revealed multiple "derogatory references," which he defined as a word or phrase creating a negative impression. *Id.* at 822. Included within this definition were words such as "shot," "pistol," "died," "death," "blood," "revolver," "guns," "wounds," and "bullets." *Id.* Dr. Michael Nietzel testified concerning public opinion polls in October 1980 and June 1981 involving multi-county samples totaling 60 and 31 respondents, respectively.

A reading of the *voir dire* that covers fifteen volumes of transcript discloses that the jurors had nothing more than a general knowledge of the case, and in some instances, an opinion of guilt. Petitioner contends that 87 prospective jurors were individually *voir dired* and that twenty-six had formed an opinion on guilt. This proportion, 30%, is dramatically lower than the comparable data in *Irvin, supra,* and *Patton, supra.* In *Irvin,* 62% of 430 veniremen had formed an opinion on guilt and in *Patton* 77% of 163 veniremen had such opinions based on pretrial publicity. It is especially important to note that not a single juror or alternate *seated* in the case at hand had formed any opinion on the guilt or innocence of petitioner. *See* Groger T.E. Vol. VII 1031; Kearnes T.E. Vol. VIII 1078; Hughes T.E. Vol. IX 1291, 1317; Pierce not asked; Herbstreet T.E. Vol. XI 1601; Adams T.E. Vol. XII 1680; Parton T.E. Vol. XII 1724; Edwards T.E. Vol. XIII 1907; Morrical not asked; Brown not asked; Acevedo T.E. Vol. XVIII 2674; Abner not asked; Carter T.E. Vol. XX 3010; Davis T.E. Vol. XXI 3227.

In light of all the above, the trial judge held that a change of venue was not necessary in that the jurors seated were impartial. Judge Neace noted that in light of the lapse of time between most of the publicity and the time of trial (nearly 18 months), any public passion stirred up by the media had time to fade. This is a relevant factor that can be taken into account by the trial court. *See Murphy, supra.* Furthermore, the trial judge was satisfied that any opinions held by the jury could be set aside. This finding by the trial judge is entitled to a presumption of correctness. Great deference must be awarded to the trial judge who heard the *voir dire* and who could observe the demeanor of the veniremen. *See* 28 U.S.C. § 2254(d); *Patton, supra.* Petitioner has failed to present any evidence as to why the statutory presumption should not apply.

Moreover, the court agrees with the analysis of the Supreme Court of Kentucky on this issue. Consequently, petitioner's

seventh contention of error is without merit.

### *ISSUE VIII—Should the trial judge have recused himself?*

The issue here is whether the petitioner was denied due process because the trial court judge refused to recuse himself after the petitioner filed a writ of prohibition against him in the State Court of Appeals to prohibit him from conducting the trial in Boone County.

Petitioner filed a writ of prohibition against the trial judge in the Kentucky Court of Appeals to prohibit him from conducting the trial in Boone County, Kentucky, after the judge refused his petition for a change of venue. Petitioner contends that the judge was represented by the Commonwealth's Attorney. In essence, petitioner asserts that he was denied due process by the judge's failure to recuse himself because the petitioner was being prosecuted by "an advocate who has already acted as the judge's counsel in the same litigation." *Rapp v. Van Dusen,* 350 F.2d 806, 812 (3rd Cir.1965).

The Commonwealth asserts that there existed no attorney-client relationship between the Commonwealth's Attorney and the trial judge. It also states that even if the Commonwealth's Attorney did represent the judge, there was no prejudice to petitioner because the judge was a mere nominal party.

Petitioner relies primarily on *Van Dusen, supra,* and *In re Murchison,* 349 U.S. 133, 75 S.Ct. 623, 99 L.Ed. 942 (1955), for the proposition that the trial judge was obligated to recuse himself. However, *Van Dusen* does not support petitioner's position because it merely stands for the rule that a judge should recuse himself when he is represented by counsel as an *active party* in the same litigation in which he is acting in a judicial capacity. *See Van Dusen,* 350 F.2d at 812–13. Where the judge is deemed a mere "nominal party," as was the case here, the judge need not recuse himself. *Id. See also, General Tire & Rubber Co. v. Watkins,* 363 F.2d 87 (4th Cir.1966); *United States v. Chase,* 309

F.Supp. 430 (N.D.Ill.1970) *vacated on other grounds* in *Chase v. Robson,* 435 F.2d 1059 (7th Cir.1970).

Also, *Murchison* is of no help to petitioner either. *Murchison* dealt with the situation where the trial judge was involved in both the grand jury investigation phase as well as the sentencing phase of the proceeding. *In re Murchison,* 349 U.S. at 137, 75 S.Ct. at 625–26. Such was not the case here. As heretofore mentioned, the trial judge here was a mere nominal party with no personal interest in the proceeding to justify recusal.

Furthermore, "recusal is not warranted absent specific instances of conduct indicating prejudice against a defendant." *United States v. Harrelson,* 754 F.2d 1153, 1165 (5th Cir.1985). Petitioner has failed to sufficiently demonstrate that he was prejudiced by the trial judge's failure to recuse himself.

*Rapp, supra,* upon which petitioner relies, turns upon its particular facts. Its rationale was disapproved in *General Tire & Rubber Co. v. Watkins, supra,* and *United States v. Chase, supra.*

Clearly, Judge Neace had no personal interest in this case. This court's reading of the trial transcript indicates that he made every effort to be fair to petitioner and exhibited no bias or prejudice whatever. Therefore, the petition for the writ must fail on this ground.

*ISSUE IX—Was expert testimony in mitigation improperly excluded?*

Petitioner's ninth contention of error is that he was denied his Eighth and Fourteenth Amendment rights when the trial court refused to allow Dr. Glen Stassen, an associate professor of Christian ethics at Southern Baptist Seminary, and Father Anthony Deye, a Catholic priest, to testify on behalf of defendant in mitigation of punishment. Petitioner contends that the capital defendant is allowed wide latitude in introducing mitigating evidence and that the testimony at issue was wrongfully excluded. Petitioner asserts that the excluded testimony of Dr. Stassen and Father Deye would have expounded on the kind of person he was, what things in his life influenced who he was, and what he had done, as well as how he felt about the crime, indicating the possibility of his rehabilitation.

During the penalty phase, the trial court prohibited the defense from calling Dr. Stassen because the court noted that it did not relate to the petitioner's "character, prior record, and circumstances of the offense," T.E. Vol. XXXII 4709, not because the court believed that it was cumulative evidence. Dr. Stassen's testimony was placed in the record by avowal. *Id.* at 4678–4708.

Father Deye, a pastor and college professor, was also prohibited from testifying before the jury but also testified by avowal. T.E. Vol. XXXI 4626–39. Petitioner contends that the testimony the two men would have communicated to the jury is as follows:

1. That petitioner was sorry for what he had done and had confessed his responsibility for the crime, and no longer used drugs;

2. That petitioner was a relatively young person at the time of the crime; that petitioner's relationship to his father, his military experience, motor cycle wreck, and long use of drugs, all weakened Paul's resistence against doing wrong and that prison would give him a chance to grow stronger;

3. That petitioner was from a family that was not influential or rich.

Petitioner argues that under *Skipper v. South Carolina,* 476 U.S. 1, 106 S.Ct. 1669, 90 L.Ed.2d 1 (1986) (evidence from jailers as to defendant's character admissible in mitigation of punishment), he was entitled to present relevant mitigating evidence to the sentencer.

The importance of the jury's consideration of mitigating circumstances in the sentencing phase of capital cases was expressed by the United States Supreme Court in *Lockett v. Ohio,* 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978). In *Lockett,* the Court noted that the Eighth and Fourteenth Amendments require that the

sentencer be given a full opportunity to consider as a mitigating factor any aspect of defendant's character or record, or any aspect of the offense that defendant proffers as a basis for a sentence less than death. 438 U.S. at 604, 608, 98 S.Ct. at 2964, 2966. *See also Eddings v. Oklahoma,* 455 U.S. 104, 113–14, 102 S.Ct. 869, 876–77, 71 L.Ed.2d 1 (1982) ("Just as the State may not by statute preclude the sentencer from considering any mitigating factor, neither may the sentencer refuse to consider, *as a matter of law,* any relevant mitigating evidence." (Emphasis added). In a footnote, the *Lockett* Court was careful to note that its opinion did not limit the authority of a court to exclude irrelevant evidence that did not relate to defendant's character, record, or circumstances of the offense. *Lockett,* 438 U.S. at 604 n. 12.

More recently, the United States Supreme Court in *Skipper v. South Carolina,* 476 U.S. 1, 106 S.Ct. 1669, 90 L.Ed. 2d 1 (1986), reiterated its holdings in *Lockett, supra,* and *Eddings, supra.* In *Skipper,* the Court held that the exclusion from the sentencing hearing of testimony of jailers and a regular visitor regarding petitioner's good behavior during the seven months he spent in jail awaiting trial deprived petitioner of his right to place before the sentencer relevant evidence in mitigation of punishment. *Skipper,* 106 S.Ct. at 1673. The Court noted that the introduction of such evidence would not be cumulative even though similar evidence was offered by members of the defendant's family in that testimony of nonfamily members would be given far greater weight by a jury than that of those close to the defendant. *Id.* The Court noted that it could not conclude that the good behavior of petitioner would have had no effect upon the jury's deliberations. *Id.*

The mitigation dictates of *Lockett* were also recently reiterated by the United States Supreme Court in *Sumner v. Shuman,* — U.S. ——, 107 S.Ct. 2716, 97 L.Ed.2d 56 (1987), wherein the Court traced the evolution of death penalty jurisprudence since *Furman* and reemphasized the importance of the sentencer's consideration of all mitigating circumstances in capital

cases. *See also Ford v. Wainwright,* 477 U.S. 399, 106 S.Ct. 2595, 2604, 91 L.Ed.2d 335 (1986) (factfinder must have all relevant information about individual to be sentenced); *Dutton v. Brown,* 812 F.2d 593, 601 (10th Cir.1987) (exclusion of mitigating evidence sought to be offered at sentencing phase by defendant's mother was not harmless, where defendant sought to have her testify that he was immature and a slow learner and subject to domination by other men).

 In the case at hand, the excluded testimony involved evidence that had already been testified to by members of the Kordenbrock family. Yet, as in *Skipper,* this fact alone cannot operate to exclude the proffered mitigation evidence as cumulative in that the jury would tend to give more weight to the testimony of nonfamily members. Relevance, however, is the threshold inquiry that must be met by the petitioner in order to assert a valid contention of error. The test is broad; that is, the evidence need only relate to the defendant's character, his record, or the circumstances surrounding the offense. *See Lockett, Eddings,* and *Skipper, supra.*

 The proffered testimony of Father Deye does not meet this relevance threshold. A reading of the trial transcript, pages 4626 through 4639, reveals that Father Deye's testimony is nothing more than a commentary on the historical evolution of moral thought regarding slavery, religious tolerance, and capital punishment. Father Deye met with petitioner only briefly before trial and had been told of Kordenbrock's background from counsel. None of the proffered testimony related to petitioner as an individual. Consequently, such testimony was properly excluded as it did not relate to petitioner's character, record, or the circumstances surrounding the offense. *See Lockett, supra.*

The testimony of Dr. Stassen falls into the same category. It is a general philosophical discussion concerning ethical and religious objections to the death penalty. It adds nothing to the jury's knowledge of

the character of the defendant or the details of the crime.

In *Lockett v. Ohio, supra,* the seminal case on this issue the Supreme Court said:

"Nothing in this opinion limits the traditional authority of a court to exclude, as irrelevant, evidence not bearing on the defendant's character, prior record, or the circumstances of his offense."

*Lockett,* 438 U.S. at 604 n. 12, 98 S.Ct. at 2965 n. 12.

The testimony was not a professional or lay opinion regarding the dangerousness of the defendant, his potential for reform, etc. as in *Skipper v. Oklahoma, supra,* but rather a generalized discussion on the witness' belief that the death penalty was morally unjustified in a civilized society. As such, its exclusion was within the discretion of the trial judge.

A further reason for finding that the trial court did not abuse its discretion by excluding the testimony of Fr. Deye and Dr. Stassen was the fact that such testimony was cumulative of that offered by Reverend Thomas Feamster, a person of similar credentials who was not a family member.

The court finds that, because of the cumulative nature of this testimony, any error in excluding it was harmless beyond a reasonable doubt.

*ISSUE X—Was petitioner improperly sentenced to death in the face of an abundance of mitigation evidence?*

■■ Petitioner's tenth contention of error is that he was denied his Eighth and Fourteenth Amendment rights when he was sentenced to death in the face of overwhelming evidence in mitigation. Petitioner admits that the presence of aggravating factors concerning the crime made him eligible to be considered for the death penalty. Yet, petitioner asserts that he had the right to demonstrate that the sentence of death would be inappropriate considering his individual characteristics.

First, petitioner claims that his intoxication prevented him from appreciating the criminality of his conduct. Second, petitioner argues that his age at the time of the crime (24) was another mitigating factor. Other mitigating factors, contends the petitioner, were his cooperation with the police, his confession of the crime, the circumstances under which he was raised, and his tour of duty in the service. Finally, petitioner notes that there was evidence in the record that he could be rehabilitated. Consequently, petitioner asserts that even though the Commonwealth established the threshold requirement for imposing the death penalty, petitioner clearly established that the death penalty would be inappropriate in light of these mitigating circumstances.

Again, petitioner's contention of error is without merit. Since the United States Supreme Court's ruling in *Furman v. Georgia,* 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972), the Supreme Court has expressed concern that the death penalty not be imposed in this country in an arbitrary and capricious manner. To this end, the Court noted that the *Furman* concerns can be met:

"by a carefully drafted statute that ensures that the sentencing authority is given adequate information and guidance. As a general proposition these concerns are best met by a system that provides for a bifurcated proceeding at which the sentencing authority is apprised of the information relevant to the imposition of sentence and provided with standards to guide its use of the information."

*Gregg v. Georgia,* 428 U.S. 153, 195, 96 S.Ct. 2909, 2935, 49 L.Ed.2d 859 (1976).

In *Gregg,* the United States Supreme Court upheld the Georgia death penalty statute which provided for the jury's consideration of the particularized nature of the crime and the individualized characteristics of the defendant. Aggravating and mitigating circumstances were to be considered, but at least one statutory aggravating factor was to be found and identified before a sentence of death could be imposed. The *Gregg* Court noted that such a statute properly channeled the jury's discretion to avoid the capricious application

of the death penalty warned against by the Court in *Furman*. *Gregg*, 428 U.S. at 206–207, 96 S.Ct. at 2940–2941.

The Supreme Court had the opportunity to express the importance of mitigating circumstances and their consideration by the jury in *Woodson v. North Carolina,* wherein the Court struck down the North Carolina death penalty statute that imposed a mandatory sentence of death upon the finding of a violation of a broad category of homicidal offenses. 428 U.S. 280, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976). The *Woodson* Court reiterated the findings of *Gregg* that the Eighth Amendment requires consideration of the character and record of the accused and the attendant circumstances of the offense and that a mandatory death penalty statute circumvented these requirements. *Woodson*, 428 U.S. at 304, 96 S.Ct. at 2991.

Two years later in *Lockett v. Ohio*, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978), the Supreme Court answered specific questions concerning mitigating factors left open by the Court in *Woodson, supra.* The *Lockett* Court struck down the Ohio death penalty statute that narrowly limited the jury's consideration of mitigating circumstances. *Lockett*, 438 U.S. at 608, 98 S.Ct. at 2967. *Lockett* noted that the Eighth and Fourteenth Amendments require that the sentencer be given a full opportunity to consider as a mitigating factor any aspect of defendant's character or record or any aspect of the offense. *Id.* at 604, 98 S.Ct. at 2964. *See also Eddings v. Oklahoma,* 455 U.S. 104, 113–14, 102 S.Ct. 869, 876–77, 71 L.Ed.2d 1 (1982) ("Just as State may not by statute preclude the sentencer from considering any mitigating factor, neither may the sentencer refuse to consider, *as a matter of law,* any relevant mitigating evidence.") (Emphasis in original).

Consequently, the law is clear that the sentencer have the opportunity to consider any mitigating circumstances but the Court has set out no standard as to how these circumstances are to be weighed. *See generally, Sumner v. Shuman,* — U.S. —, 107 S.Ct. 2716, 2719–23, 97 L.Ed.2d 56 (1987) (informative summary of evolution of death penalty jurisprudence since *Furman* ).

Kentucky's death penalty statute, KRS 532.025, requires that an aggravating circumstance be found beyond a reasonable doubt in order for the death penalty to be imposed. Furthermore, the statute properly permits the sentencer to consider any mitigating circumstances authorized by law or listed in the statute. The Kentucky state courts are not limited by the statutory definition of mitigating circumstances, but all evidence that would tend to excuse or lessen a defendant's responsibility is permitted. *Smith v. Commonwealth,* 599 S.W.2d 900 (Ky.1980). Hence, the Kentucky death penalty statute comports with constitutional requirements; there is no constitutional violation in not providing a certain weight to be accorded such mitigating circumstances. Kentucky's statute, which also requires state court review for the influence of an arbitrary factor and supporting evidence of the aggravating circumstance, is constitutional even though it only provides for the consideration of, and not the weighing of, mitigating and aggravating factors. *Gregg, supra.*

The jury in this case found the existence of a statutory aggravating circumstance (murder in the course of a first degree robbery) beyond a reasonable doubt. Transcript of the Record (hereinafter T.R.) Vol. XII 850. In making this determination, the jury considered these mitigating circumstances with regard to petitioner:

> In recommending a sentence for the defendant Paul Kordenbrock you shall consider such mitigating or extenuating facts and circumstances as have been presented to you in the evidence and you believe to be true, *including but not limited to* such of the following as you believe from the evidence to be true:
>
> a) That he was a relatively young man at the time of the offense.
>
> b) The circumstances under which he was raised.
>
> c) That he cooperated with the police.
>
> d) That his capacity to commit the offense of murder was lessened by mental

difficulties or the intake of drugs, and that his ability to maturely and meaningfully deliberate, reflect and intend the death of Stanley Allen was lessened by mental problems or by the effects of drugs.

e) That a motorcycle accident caused him disorder and problems in his life.

f) That a tour of duty in the service caused him serious difficulties in his life.

g) That he confessed to the crimes.

h) That he is sorry for killing Stanley Allen.

i) That he can be rehabilitated.

j) That he pled guilty to first degree robbery.

In addition to the foregoing, you shall consider also those aspects of the defendant's character and those facts and circumstances of the particular offense of which you have found him guilty, about which he has offered evidence in mitigation of the penalty to be imposed upon him and which you belived [sic] from the evidence to be true.

T.R. Vol. XII 846–47 (emphasis added).

The jury was further instructed that the death penalty was not mandatory with the finding of the aggravating circumstance, and that the death penalty was a viable option with the finding of an aggravating circumstance and mitigation. T.R. Vol. XII 844. The jury found the aggravating circumstance beyond a reasonable doubt. T.R. Vol. XII 850–51. Furthermore, the trial judge considered evidence in mitigation before sentencing the petitioner. T.E. Vol. XXXII 4817. Hence, pursuant to *Lockett* and *Eddings, supra,* the sentencer was not precluded from considering as mitigation any aspect of petitioner's character, record, or any circumstance of the offense. The jury properly considered the mitigating evidence as was required of them. The jury was required by the Constitution only to consider the evidence in mitigation, not to afford it any particular weight. This channeled discretion is what protects the process from the capriciousness feared by the *Furman* Court. *Gregg,* 428 U.S. at 189, 96 S.Ct. at 2932.

In effect, petitioner is asking this court to direct a verdict on the penalty phase of this case. The evidence showed that petitioner committed a deliberate, brutal murder. If, as the jury found, he had the required intent, the penalty is for the state judge and jury to decide.

*ISSUE XI—Did the instructions at the guilt/innocence phase and the penalty phase of the trial violate petitioner's constitutional rights?*

■ The petitioner contends that the trial judge made the following errors when he gave the instructions:

(1) he refused to instruct the jury that it had to make specific findings of mitigating factors;

(2) the instructions should have defined mitigating factors;

(3) the instructions should have defined the standard of proof for the finding of mitigation as a "preponderance of the evidence" standard;

(4) he failed to instruct the jury members on how mitigating and aggravating factors were to be considered and what function they were to play in their decision; he also failed to state that the factors were to be weighed and that aggravating factors must outweigh mitigating factors beyond a reasonable doubt;

(5) he implicitly told the jury that its findings and verdict must be unanimous instead of telling it that a less than unanimous finding was all that was necessary to find the existence of mitigating circumstances; and

(6) he should have instructed the jury that a life sentence means life and that it cannot legally presume otherwise.

The respondent on the other hand states that complaints about instructions should not be reviewable in this instance and that even if they were reviewable, they were proper.

Generally, errors made by the trial judge while instructing the jury in a state criminal trial are not reviewable in federal habeas corpus proceedings. *Long v. Smith,* 663 F.2d 18 (6th Cir.1981). The Supreme Court

in *Henderson v. Kibbe*, 431 U.S. 145, 97 S.Ct. 1730, 52 L.Ed.2d 203 (1977), stated the standard to be followed when reviewing instructions. The Court stated that:

> "The burden of demonstrating that an erroneous instruction was so prejudicial that it will support a collateral attack on the constitutional validity of a state court's judgment is even greater than the showing required to establish plain error on direct appeal. *The question in such a collateral proceeding is 'whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process' ... not merely whether 'the instruction is undesirable, erroneous, or even "universally condemned,"....'"* (Emphasis added).

*Id.* at 154, 97 S.Ct. at 1736–37.

These cases then reveal that the instructions in this case are not reviewable here.

Even if the instructions were reviewable, it is evident the instructions were proper. Listed below is a point by point analysis as to why the petitioner's arguments fail.

■ (1) *Argument One.* The jury need not make specific findings on mitigating factors. *See* KRS 532.025(2) (requires only that jury *consider* mitigating factors); *Martin v. Maggio*, 711 F.2d 1273, 1286–87 (5th Cir.1983) (Constitution does not require jury to list mitigating circumstances).

■ (2) *Argument Two.* Instructions need not define mitigating circumstances. *See Peek v. Kemp*, 784 F.2d 1479, 1494 (11th Cir.1986) (instructions need not include particular words or phrases to define mitigation, what is important is that jury could not have misunderstood the meaning and function of mitigating circumstances).

(3) *Argument Three.* Instructions need not define the standard of proof for the finding of mitigating factors as a preponderance of the evidence standard. *See Peek*, 784 F.2d at 1494.

(4) *Argument Four. Peek* is also applicable here. Failure to instruct the jury as to how mitigating factors are to be used and their function is not necessarily constitutional error. What is important is that the jury understood its role. *Peek*, 784

F.2d at 1494. In this case, the instructions made the jury's role reasonably clear. Further, a balancing process is not required. *See Zant v. Stephens*, 462 U.S. 862, 876–77 n. 13, 103 S.Ct. 2733, 2742 n. 13, 77 L.Ed.2d 235 (1983).

(5) *Argument Five.* It is evident that there is no language in the instructions which would lead the jury to believe that it must unanimously find the existence of mitigating circumstances.

■ (6) *Argument Six.* Petitioner is not entitled to an instruction telling the jury that life sentence means life sentence and that it could not legally presume otherwise. *See Tucker v. Zant*, 724 F.2d 882, 892 (11th Cir.1984), *vacated on other grounds*, 474 U.S. 1001, 106 S.Ct. 517, 88 L.Ed.2d 452 (1985) (no constitutional violation where trial judge failed to instruct the jury to disregard the possibility that the capital defendant could be paroled if sentenced to life).

In conclusion, it is determined, pursuant to the authority of *Long* and *Henderson*, that the instructions need not be reviewed in this case. In addition, even if the instructions were reviewable, after careful study of the instructions, it is evident that they were not constitutionally deficient.

*ISSUE XII—Were the petitioner's rights violated because the trial judge refused to instruct the jury on the petitioner's theory of the case—diminished capacity?*

Petitioner argues in this case that there was evidence to support the conclusion that there was doubt as to whether the petitioner had the requisite intent or capacity to kill the victim and, therefore, under Kentucky law, petitioner might have been convicted of a lesser offense had the trial judge so instructed the jury. Specifically, the petitioner asserts that he was denied due process of the law because the trial judge refused to read to the jury the following tendered instruction:

> It is Paul Kordenbrock's defense that his ability to intentionally murder was impaired by mental illness, the drugs and

alcohol that he took to the point that he had a wanton mental state.

If you find from the evidence that at the time the alleged crime was committed, Paul Kordenbrock had a substantially reduced mental capacity, whether caused by mental illness, mental defect, intoxication by either alcohol or drugs, or any other cause, you must consider what effect this diminished capacity had on Paul Kordenbrock's ability to form any specific mental state that is an essential element of murder.

Thus, if you find that Paul Kordenbrock's mental capacity was diminished or lessened to the extent that you have a reasonable doubt whether he did, maturely and meaningfully, deliberate and intend to kill Stanley Allen or wantonly cause the death of Stanley Allen, you cannot find him guilty of intentional murder. You then must find Paul Kordenbrock guilty of wanton murder.

T.R. Vol. XI 771.

The petitioner asserts that the trial judge's failure to give this instruction was constitutional error under the authority of *Beck v. Alabama*, 447 U.S. 625, 100 S.Ct. 2382, 65 L.Ed.2d 392 (1980). The Court in *Beck* held that it would be constitutional error to impose the death penalty " 'after a jury verdict of guilt of a capital offense, when the jury was not permitted to consider a verdict of guilt of a lesser included non-capital offense, and when the evidence would have supported such a verdict....' " 477 U.S. at 627, 100 S.Ct. at 2384. Petitioner contends that there was sufficient evidence for the trial judge to instruct the jury that if it found the petitioner had diminished capacity at the time of the offense, then he could be convicted of a lesser offense which would not include the death penalty. *See also People v. Horn*, 12 Cal.3d 290, 115 Cal.Rptr. 516, 524 P.2d 1300 (1974).

The respondent argues, as he did in Issue XI, *supra*, that jury instruction questions are not generally reviewable in habeas cases and that the petitioner received sufficient instructions in this case.

Petitioner's reliance on *Beck* is misplaced. *Beck* merely stands for the proposition that where the evidence warrants it, a jury must be permitted to consider a verdict of a lesser included non-capital offense. *Beck*, 447 U.S. at 627, 100 S.Ct. at 2384. Here, the jury was indeed permitted to consider convicting the petitioner of a lesser offense.

The trial judge did instruct the jury that it could convict Kordenbrock of intentional murder, wanton murder, first degree manslaughter, second degree manslaughter, or reckless homicide. *See* T.E. Vol. XXX 4389–94. The judge told the jury that for the petitioner to be convicted of intentional murder, it would have to believe beyond a reasonable doubt that he "intended to cause Stanley Allen's death and ... [t]hat when he did so he was not so intoxicated that by reason of his intake of drugs he did not have a conscious intention to kill Stanley Allen." *Id.* at 4389–90. Further, the trial court defined "intentionally" for the jury: "a person acts intentionally with respect to another's death when it is his conscious objective to cause that death." *Id.* at 4395.

Petitioner's argument fails first because errors made by the trial judge while instructing the jury in state criminal trials are not generally reviewable in federal habeas corpus proceedings. *Long v. Smith*, 663 F.2d 18 (6th Cir.1981); *Henderson v. Kibbe*, 431 U.S. 145, 97 S.Ct. 1730, 52 L.Ed. 2d 203 (1977). Second, even if the matter were reviewable before this court, it is clear that the trial judge did give sufficient instructions concerning lesser offenses. As heretofore stated, petitioner in total received instructions on intentional murder with an intoxication mitigation, wanton murder, first degree manslaughter with an intoxication mitigation, second degree manslaughter, and reckless homicide. Consequently, no constitutional error occurred with respect to this issue.

*ISSUE XIII—Did the Prosecutor's closing arguments rise to the level of constitutional error?*

Petitioner's thirteenth contention of error is that he was denied his Sixth

Amendment right to present a meaningful defense and have effective assistance of counsel, his Eighth Amendment right to have a higher degree of reliability in death penalty cases, and his Fourteenth Amendment right to due process of law by the prosecutor's allegedly improper closing arguments during both phases of the trial.

Petitioner argues that the prosecutor purposely used both summations to cajole and improperly influence the jury to return a sentence of death. Petitioner notes that the prosecutor disparaged the defenses presented by the petitioner and that the prosecutor evoked unmitigated sympathy for Mr. Allen, the victim.

Petitioner further alleges that part of his defense was that since his involvement in the murder he had become a changed man. Testimony was submitted by several witnesses, including petitioner's sister, a priest, and others to the effect that he was sorry for what he had done and that he displayed a genuine concern for others. Kordenbrock claims that the prosecutor went out of his way to disparage this defense, this being particularly harmful because the jury was called upon to determine what the appropriate punishment would be for the petitioner as they found him *at that time.* Petitioner also notes that the prosecutor told the jury that petitioner had only pretended to change to avoid a death sentence. Kordenbrock contends that under current case law, this is clearly improper.

Petitioner also presented a defense that he was under the influence of drugs at the time he committed the crime and hence did not have the full capacity to understand what he was doing. He argues that that the prosecutor again disparaged this defense in suggesting the petitioner had concocted this story for the purpose of avoiding the "murder rap."

Furthermore, petitioner argues that he did not have a preconceived intent to murder the victims for the purpose of escaping because he did not kill the other two persons in the vicinity of the crime. The prosecutor, argues the petitioner, disparaged this defense as well by stating that the reason Kordenbrock didn't kill the other two persons present was because he was stupid in not disposing of all the eye witnesses, not because he didn't have a preconceived intent to kill. Petitioner contends that the fact he let Webster and his son leave is pertinent to the question of whether or not he acted with a preformed intent to kill Allen. Hence, the prosecutor should not have disparaged this defense.

Next, Kordenbrock contends that the prosecutor improperly appealed to class prejudice during closing summations by type casting him as an "unemployed" "underground" drug addict. T.E. Vol. XXX 4446–58. Such appeals to class prejudice, argues petitioner, are improper.

Finally, petitioner argues that the prosecutor improperly stirred up extreme sympathy for the victim and that the probative value of such evidence was far outweighed by its inflammatory nature. Specifically, and most egregiously, argues petitioner, was the prosecutor's admonition to the jury not to forget Mr. Allen, the victim: "[H]e had a right to live." T.E. Vol. XXX 4465–66. Petitioner contends this was highly improper. In addition, petitioner contends that the prosecutor referred to the personal characteristics of the victim in closing argument in violation of United States Supreme Court dictates to the contrary. For instance, the prosecutor commented that the victim was lying on a slab in a morgue and that somewhere out there today the rain falls on the victim's grave. Furthermore, the prosecutor recreated the morning of the murder by describing Allen's actions from the time he awoke to the time of the murder, commenting that little did the victim know that that would be the last time he would dress himself. The prosecutor described the victim's garments as his "death shroud."

Although forceful, the prosecutor's closing statements do not rise to the level of constitutional error. In *Darden v. Wainwright,* the United States Supreme Court most recently set out the standard for assessing the propriety of a prosecutor's closing arguments. 477 U.S. 187, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986). In *Darden,*

the Court noted that the relevant inquiry is whether the prosecutor's comments "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Darden*, 106 S.Ct. at 2472 (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974)). *See also United States v. Nixon*, 816 F.2d 1022, 1031 (5th Cir.1987); *United States v. Weddell*, 800 F.2d 1404, 1411 (5th Cir.1986). The *Darden* Court further noted that the prosecutor's closing argument should be evaluated in light of the defense arguments that preceded the prosecution's. *Id.*, 106 S.Ct. at 2471. To this end, the Court noted that many of the prosecutor's objectionable comments were invited by the defense counsel's comments. The Court was careful to note that "the idea of 'invited response' is used not to excuse improper comments, but to determine their effect on the trial as a whole." *Id.* at 2472 (citing *United States v. Young*, 470 U.S. 1, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985)).

■ In the case at hand, the prosecutor's comments did not so infect "the trial with unfairness as to make the resulting conviction a denial of due process." First, the Commonwealth did not violate the United States Supreme Court's holding in *Booth v. Maryland*, — U.S. —, 107 S.Ct. 2529, 96 L.Ed.2d 440 (1987), in that the prosecutor did not comment on the personal characteristics of the victim in the penalty phase of the trial. *See* T.E. Vol. XXXII 4774–85. The closing remarks during the sentencing phase of the trial were limited to general comments concerning the instructions and the deterrent effect of the death penalty. Such comments were clearly proper. *See Davis v. Kemp*, 829 F.2d 1522, 1527–28 (11th Cir.1987) (arguments by prosecutor at sentencing phase of capital murder trial that death penalty serves as deterrent not improper). It is true that the prosecutor did comment upon some personal characteristics of the victim during the guilt-innocence phase of the trial, but there is no evidence that such comments "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *See Darden, supra*. Like the *Darden* case, the prosecutor's argu-

ments did not misstate or manipulate the evidence. As to the disparaging of petitioner's defenses, the prosecutor's comments were but a response to the closing of petitioner during the guilt-innocence phase. In addition, there was overwhelming evidence to support a conviction of the petitioner and hence, it was unlikely that the jury's decision was influenced by the prosecutor's closing arguments. Taking into account all of these considerations, it was unlikely that the prosecutor's closing arguments were so unfair as to deny the petitioner due process. *See Darden*, 106 S.Ct. at 2471–73 (above elements considered by Court in determining whether arguments so unfair as to deny due process).

Petitioner relies heavily on the recent decision of the Supreme Court of the United States in *Booth v. Maryland*, — U.S. —, 107 S.Ct. 2529, 96 L.Ed.2d 440 (1987). In that case, the jury, pursuant to statute, was presented with a victim impact statement describing the victim, his family and the adverse effect of the murder on them in great detail. The Court held the statute unconstitutional. In this court's reading of *Booth*, the scope of the opinion is not intended to reach closing argument of the kind made here, where the jury was reminded that crime has victims. And that this crime had a victim who was a person, who had a family who were also persons. This is not an unfair approach by the prosecution in response to the defense's indefatigable effort to present the defendant and his family as suffering persons.

As the court in *Brooks v. Kemp*, 762 F.2d 1383 (11th Cir.1985) (en banc), *vacated on other grounds* in *Kemp v. Brooks*, — U.S. —, 106 S.Ct. 3325, 92 L.Ed.2d 732 (1986), this court is convinced after a thorough review of the entire record that "the verdict here was imposed because of valid sentencing considerations and ... there is no reasonable probability that the prosecutorial misconduct changed the outcome. [The] sentencing phase was not unfair." 762 F.2d at 1416.

As stated by the Eleventh Circuit in *Brooks, supra:*

"While argument focusing on the victim can be dangerous, not all prosecutorial references to the victim are improper. The fact that there is a victim, and facts about the victim properly developed during the course of the trial, are not so far outside the realm of 'circumstances of the crime' that mere mention will always be problematic. It is not necessary that the sentencing decision be made in a context in which the victim is a mere abstraction.

"Here, Whisnant asked the jury to remember 'the person who is not here ... Carol Jeannine Galloway.' He then ticked off some personal attributes shown by the evidence, *i.e.*, that she was a pretty, 23–year old, unmarried woman living with her parents and that she was a considerate person of high morals. These comments did personalize the victim, but they were brief enough that we cannot conclude that they injected prejudicial or irrelevant material into the sentencing decision."

*Id.* at 1409.

The prosecutor's remarks here were not nearly as vehement as those of the prosecutor in *Brooks* or *Darden, supra,* where the defendant was referred to as an "animal" and the prosecutor stated that he wished the defendant had shot himself and saved the state the trouble. 106 S.Ct. at 2471–73.

 Nor is it improper to point out to the jury the deterrent effect of the death penalty. *Brooks*, 762 F.2d at 1409. Indeed, in my view, the only moral justification for the death penalty is the consideration that it may save the lives of innocent people in the future by acting to deter murder.

This court finds the prosecution argument zealous, but not overzealous, hard-hitting, but not unfair. Consequently, petitioner's thirteenth contention of error is without merit.

**2.** This case does not present a situation like that of *Hitchcock v. Dugger,* —— U.S. ——, 107 S.Ct.

*ISSUE XIV—Whether Kentucky's death penalty statute violates the Eighth and Fourteenth Amendments.*

 Petitioner asserts that Kentucky's death penalty statute is unconstitutional because:

(1) it denied him of his right to introduce all mitigating evidence since the statute only allows statutory mitigating circumstances and those otherwise authorized by law to be considered;

(2) it provides no standards to guide the jury in determining who should live or die;

(3) it does not provide directions to judge and jury for balancing aggravating circumstances against the mitigating ones;

(4) its language concerning "recommendation" does not provide clear guidance on what responsibilities the jury, judge, and appellate court are required to exercise.

The Commonwealth responds that the United States Supreme Court has recently approved Georgia's capital punishment statute upon which Kentucky's is based. It also contends that the statute provides guidance for the sentencer while at the same time allowing for suitable discretion.

KRS 532.025(2) states that:

"In all cases of offenses for which the death penalty may be authorized, the judge shall consider, or he shall include in his instructions to the jury for it to consider, any mitigating circumstances or aggravating circumstances otherwise authorized by law and any of the following statutory aggravating or mitigating circumstances which may be supported by the evidence...."

The statute then provides a list of aggravating and mitigating circumstances. This language makes it clear that the consideration of mitigating factors is not limited to those listed in the statute. The statute expressly states that all mitigating circumstances "authorized by law" shall be considered. Therefore, the petitioner's argument that the statute unconstitutionally limits introduction of mitigating evidence is without merit.[2]

1821, 95 L.Ed.2d 347 (1987), or *Sumner v. Shuman,* —— U.S. ——, 107 S.Ct. 2716, 97 L.Ed.2d 56

Regarding petitioner's second argument, it is true that guidance and direction is necessary to prevent the sentencer from acting arbitrarily and capriciously in determining the sentence. *See Gregg v. Georgia,* 428 U.S. 153, 197, 96 S.Ct. 2909, 2936, 49 L.Ed.2d 859 (1976); *Furman v. Georgia,* 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972). However, all discretion need not be, and should not be, taken from the jury by statutory guidelines. The Kentucky death penalty statute allows for discretion but it is controlled by clear and objective standards and, therefore, proper.[3] After a person has been found guilty of a capital offense, the statute calls for a presentence hearing where the jury is to consider any aggravating or mitigating circumstances and then make a recommendation of sentence to the trial judge. KRS 532.025(1)(b). The judge then is required to fix the sentence within the limits prescribed by law. *Id.* Such procedure provides a clear objective standard which will guide the sentencer and still allow for reasonable discretion. Also, the United States Supreme Court in *Gregg* considered the validity of Georgia's death penalty statute upon which Kentucky's is based and determined the statute to be constitutional. *Gregg,* 428 U.S. at 207, 96 S.Ct. at 2941.

Contrary to petitioner's assertions, there is no constitutional requirement that a death penalty statute direct a sentencer to balance aggravating and mitigating circumstances. *See e.g., Zant v. Stephens,* 462 U.S. 862, 876–77 n. 13, 103 S.Ct. 2733, 2742 n. 13, 77 L.Ed.2d 235 (1983); *Jurek v. Texas,* 428 U.S. 262, 270–74, 96 S.Ct. 2950, 2955–57, 49 L.Ed.2d 929 (1976).

Lastly, petitioner's argument concerning the "recommendation" language is also without merit. The statute reads in part: "Upon the conclusion of the evidence and arguments, the judge shall give the jury appropriate instructions, and the jury shall retire to determine whether any mitigating or aggravating circumstances, as defined in subsection (2) of this section, exist *and to recommend a sentence* for the defendant. Upon the findings of the jury, the judge shall fix a sentence within the limits prescribed by law." (Emphasis added)

KRS 532.025(1)(b).

This language obviously provides sufficient guidance and direction under which the dictates of *Gregg* and *Proffitt v. Florida,* 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976). What is of vital importance is that the jury "consider the circumstances of the crime and the criminal before it recommends a sentence." *Gregg,* 428 U.S. at 197, 96 S.Ct. at 2936. This the Kentucky statute requires of the jury. For these reasons the Kentucky statute is not in violation of the Eighth and Fourteenth Amendments.

## ISSUE XV—Did the Kentucky Supreme Court conduct its proportionality review properly?

The petitioner contends that the Kentucky Supreme Court failed to carry out its statutorily required proportionality review process in a way which comports with due process. It is argued that the State Supreme Court improperly limited its review to only those cases in which the death penalty was returned because that would not include all similar cases as is required by the language of the statute. Kordenbrock also asserts that the Kentucky Supreme Court denied him access to public information concerning the proportionality review process and that this obstruction denied him effective assistance of counsel and his right to present a full and meaningful defense.

(1987), where the sentencer was prevented from considering relevant mitigating circumstances. A critical question in determining the constitutionality of a death penalty statute is whether the statute prevents the sentencer from considering relevant mitigating circumstances. *Sumner,* 107 S.Ct. at 2721. The Kentucky statute does not prevent the sentencer from consideration of relevant mitigating factors. It broadly allows for the consideration of "any mitigating circumstances ... authorized by law." *See* KRS 532.025(2).

**3.** *See Gregg,* 428 U.S. at 198, 96 S.Ct. at 2937; *Proffitt v. Florida,* 428 U.S. 242, 258, 96 S.Ct. 2960, 2969, 49 L.Ed.2d 913.

The Commonwealth responds by stating that *Pulley v. Harris,* 465 U.S. 37, 104 S.Ct. 871, 79 L.Ed.2d 29 (1984), does not require a state appellate court to conduct a proportionality review before affirming the death sentence; therefore, the proportionality review and petitioner's access to state court data is not a federal question meriting review by this court. It also states that even if a federal question were to exist, the proportionality review of the Kentucky Supreme Court was constitutional.

▓▓▓▓ Pursuant to statutory authority, the Kentucky Supreme Court reviews the imposition of death penalties and determines whether the sentence is excessive or disproportionate to the penalties imposed in similar cases.[4] The Commonwealth is correct in its assertion that such review is not constitutionally mandated. *See Pulley,* 465 U.S. at 44–45, 104 S.Ct. at 876. However, since the state has opted to act in an area where it has discretion, it nonetheless must conduct such review according to constitutional guidelines. *See Evitts v. Lucey,* 469 U.S. 387, 105 S.Ct. 830, 839, 83 L.Ed.2d 821 (1985). In this case, Kordenbrock claims the Kentucky Supreme Court failed to conduct the proportionality review according to constitutional requirements because it limited its scope of review to only cases where the death penalty was imposed.

▓▓▓▓ In habeas proceedings the federal court is generally not required to reexamine the state's proportionality review. *Moore v. Balkcom,* 716 F.2d 1511, 1517 (11th Cir.1983), *reversed in part on other grounds* in 824 F.2d 847 (11th Cir.1987). This doctrine of non-interference is applicable unless the petitioner can show that the imposition of capital punishment in his case "shocks the conscience." *Id.* at 1518. *See also, Spinkellink v. Wainwright,* 578 F.2d 582, 606 n. 28 (5th Cir.1978); *Godfrey v. Francis,* 613 F.Supp. 747, 763 (N.D.Ga. 1985).

▓▓▓▓ Kordenbrock forced two store workers to lie face down on the floor at gun point while his companion robbed guns from the establishment. Kordenbrock shot the victims in the back of the head while they laid helpless on the floor. One lived, the other did not. Clearly, this is not a situation where infliction of capital punishment "shocks the conscience." Consequently, it is not within this court's realm to reexamine the state court's proportionality review.

Further, as the Eleventh Circuit recently made clear, the Constitution neither mandates a proportionality review nor, where such a review is required by state law, does federal due process require that state courts "make an explicit, detailed account of their comparisons." *Lindsey v. Smith,* 820 F.2d 1137, 1154 (11th Cir.1987). As the *Lindsey* case pointed out:

"Based on their own past experience in reviewing capital punishment cases, state appellate courts 'can rationally distinguish between those individuals for whom the death penalty is an appropriate sanction and those for whom it is not,' *Spaziano v. Florida,* 468 U.S. 447, 104 S.Ct. 3154, 3163, 82 L.Ed.2d 340 (1984), without listing in their opinions the facts that did or did not justify the imposition of the death penalty in prior cases."

▓▓▓▓ Similarly, petitioner is not entitled to conduct discovery as to the manner in which the Supreme Court of Kentucky conducts its proportionality review since allowing such a procedure would invade the confidentiality of the proceedings of that court. *Roach v. Martin,* 757 F.2d 1463, 1472 (4th Cir.1985).

▓▓▓▓ Nor is the petitioner entitled to an evidentiary hearing in this habeas proceeding as to the due process aspects of the manner in which the proportionality review

---

**4.** KRS 532.075(1) states in part that "[w]henever the death penalty is imposed for a capital offense, and upon the judgment becoming final in the circuit court, the sentence shall be reviewed on the record by the Supreme Court." The relevant portion of section 532.075(3) states:

"[w]ith regard to the sentence, the court shall determine: ... (c) Whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant."

was performed. *Jeffers v. Ricketts*, 627 F.Supp. 1334, 1363 (D.Ariz.1986).

### ISSUE XVI—Is there arbitrary application of the death penalty in Kentucky?

Petitioner's sixteenth contention of error is that his Sixth, Eighth and Fourteenth Amendment rights were denied by the manner in which the death penalty is being applied in Kentucky. Specifically, petitioner alleges that the application of the Kentucky capital punishment law is unconstitutional as applied to him in that he was sentenced to death because (1) his victims were white, (2) his family is poor and not influential, (3) he could not afford private counsel or hire private experts, and (4) he is a man. Petitioner submits the affidavit of the Honorable Kevin McNally and data attached thereto to attempt to demonstrate that in Kentucky's capital sentencing scheme, there exists a risk of racially based discrimination that is so acute that it violates the Eighth Amendment. Furthermore, petitioner contends that because the statistics demonstrate a strong probability that petitioner's sentencing jury was improperly influenced by the fact that his victim was white, the death penalty is being applied in violation of the Eighth Amendment.

Petitioner sets out the specific statistics as they pertain to the application of the death penalty in Kentucky. First, petitioner notes that of the 43 persons who have received jury recommendations of death in Kentucky since the statute's effective date in 1976, only one individual, or 2.3% of those sentenced to death row, has been convicted of killing a member of a minority group. Furthermore, petitioner notes that from the effective date of Kentucky's death penalty statute through January 1, 1985, there were approximately 544 nonwhite victims of murder or nonnegligent homicide, 22.4% of the total. *Crime in Kentucky, Uniform Crime Reports* (Dept. of Justice, Com. of Ky., 1977–85). As there have been 1888 white victims of murder or nonnegligent homicides in Kentucky between 1977–85, 77.6% of the total, the chances of being on death row if you kill a white person are .015, or 15 out of 1000. If you kill a nonwhite, the chances of being on death row are far less, approximately 2 chances out of 1000, or 7 times less likely.

Next, petitioner sets forth statistics as to the discriminatory treatment of defendants based on their gender. Petitioner notes that there were 279 females arrested for murder or nonnegligent homicide between 1977–85 (13% of the total of 2,104) and only one female has received the death penalty. Her conviction and sentence, notes the petitioner, was overturned on appeal. *O'Bryan v. Commonwealth*, 634 S.W.2d 153 (Ky.1982). She was resentenced to a term of years. The petitioner presented evidence to the effect that the likelihood of a female being sentenced to death for committing murder or nonnegligent homicide is near zero at this time. In contrast, petitioner notes that of the 1825 males arrested for murder or nonnegligent homicide, 30 are on death row.

Petitioner rightfully takes note of the United States Supreme Court opinion of *Furman v. Georgia*, wherein the Court noted that the death penalty "may not be imposed under sentencing procedures that create a substantial risk that the punishment will be inflicted in an arbitrary and capricious manner." 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972). Yet, what the petitioner fails to address and fully discuss is the recent Supreme Court opinion of *McCleskey v. Kemp*, —— U.S. ——, 107 S.Ct. 1756, 95 L.Ed.2d 262 (1987), and its impact on the arguments asserted by him.

In *McCleskey*, the Court was presented with the issue of whether a reliable statistical study demonstrating that racial considerations may enter into capital sentencing determinations invalidates a defendant's death sentence under the Eighth and Fourteenth Amendments of the United States Constitution. McCleskey was a black man, and in support of the contention of error presented in his petition for a writ of habeas corpus, McCleskey submitted to the Court a study conducted by Professors Baldus, Woolworth, and Pulaski, (the Baldus study) that statistically demonstrated that the death sentence in Georgia was dispar-

ately imposed based on the race of the murder victim, and to a lesser extent, on the race of the defendant. 107 S.Ct. at 1763.

As to McCleskey's Equal Protection claim, the Court noted that petitioner offered no evidence as to his own case "that would support an inference that racial considerations played a part in his sentence." *Id.* at 1766–67. In other words, petitioner failed to prove the existence of purposeful discrimination as to his particular case, or that purposeful discrimination involved in the sentence had a discriminatory effect on him. McCleskey relied solely on the study demonstrating a disparate impact.

As to McCleskey's Eighth Amendment claim that his sentence was disproportionate to those imposed in other murder cases, the Court responded that McCleskey's constitutional rights were not violated simply because he could demonstrate that others similarly situated were not sentenced to death. *Id.* at 1774. Instead, noted the Court, a certain amount of discretion is built into the sentencing procedure and such discretion does not necessarily indicate an arbitrary and capriciously imposed sentence. *Id.*

Likewise, in the case at hand, petitioner has not demonstrated that the sentencer engaged in purposeful discrimination as to him. Petitioner relies solely on the statistics gathered by experts concerning the disparate impact generated by Kentucky's death sentencing practices. Demonstrating this arbitrary and disparate application in Kentucky, reasons the petitioner, is enough to conclude that he was arbitrarily dealt with in the imposition of his sentence. In *McCleskey*, the Supreme Court specifically rejected this reasoning, calling for a demonstration of specific intent to discriminate as to the individual defendant. No specific intent to discriminate against him is claimed by petitioner.

In a similar vein, petitioner has not set forth any evidence to support his contention that he was sentenced to death because his family is poor and uninfluential, and because he could not afford private counsel or hire private experts. Mere alle-

gations without more cannot support any contention of discrimination especially in light of the *McCleskey* criteria that specific intent to discriminate as to a particular defendant be demonstrated.

Such generalized contentions could invalidate all criminal convictions if accepted by the courts.

In short, *McCleskey, supra,* is fatal to petitioner's contentions on this issue.

*ISSUE XVII—Whether petitioner's allegations of underrepresentation of young adults on the jury, and of young adults and women as jury commissioners and grand jury foremen, demonstrate a constitutional violation.*

Petitioner alleges the following as constitutional errors:

(1) There was a substantial disparity between the representation of young people in the jury pool and the representation of young people in the community;

(2) There was a substantial disparity between the representation of young people in the source lists used by the jury commissioners and the representation of that class in the community;

(3) The procedure employed in the selection of grand jury foremen and jury commissioners resulted in substantial underrepresentation of young people and females.

The Commonwealth responds by contending that young people are not a cognizable group and that petitioner has no standing to allege an equal protection violation for any disparity of women as grand jury foremen or commissioners. It also asserts that discrimination in the selection of grand jury foremen is not a due process violation and that the petitioner has presented insufficient evidence of a due process violation in the selection of jury commissioners.

Moreover, the heart of petitioner's claim is that young people were underrepresented in the jury pool and that women and young people were underrepresented as jury commissioners and grand jury foremen.

■ The Supreme Court has stated early on that the Constitution requires that jury members be drawn from a fair cross-section of the community. *See Glasser v. United States*, 315 U.S. 60, 85, 62 S.Ct. 457, 471–72, 86 L.Ed. 680 (1942); *Thiel v. Southern Pacific Co.*, 328 U.S. 217, 66 S.Ct. 984, 90 L.Ed. 1181 (1946).

The Court has also clearly enunciated the elements needed to establish a *prima facie* violation of the cross-section requirement. *See Duren v. Missouri*, 439 U.S. 357, 99 S.Ct. 664, 58 L.Ed.2d 579 (1979). The Court in *Duren* noted:

"In order to establish a prima facie violation of the fair-cross-section requirement, the defendant must show (1) that the group alleged to be excluded is a 'distinctive' group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process."

*Id.* at 364, 99 S.Ct. at 668.

With regard to the first element above, various groups have in the past been held to be cognizable groups. *See e.g., Thiel*, 328 U.S. at 223, 66 S.Ct. at 987 (daily wage earners as compared to those paid by salary); *Ballard v. United States*, 329 U.S. 187, 67 S.Ct. 261, 91 L.Ed. 181 (1946) (women); *Hernandez v. Texas*, 347 U.S. 475, 74 S.Ct. 667, 98 L.Ed. 866 (1954) (Mexican—Americans). However, as recently as 1985, the Court of Appeals for the First Circuit stated that all circuits which have considered the issue of whether young people comprise a cognizable group have answered the question in the negative. *See Barber v. Ponte*, 772 F.2d 982, 1000 (1st Cir. 1985).

The decision of *Barber v. Ponte* discussed the issue and how the circuits have dealt with it. The court there stated: ·

"Apparently appellant was under the misapprehension, as he has been throughout this appeal, that the establishment of mere statistical disparity in the chosen age group is sufficient to establish a prima facie violation under the sixth amendment. It is beyond argument, however, that the first step in such a claim is the demarcation of a 'distinctive' group.

\* \* \* \* \* \*

"This requires: (1) that the group be defined and limited by some clearly identifiable factor (for example, sex or race), (2) that a common thread or basic similarity in attitude, ideas, or experience run through the group, and (3) that there be a community of interest among the members of the group, such that the group's interests cannot be adequately represented if the group is excluded from the jury selection process.

\* \* \* \* \* \*

"Although the Supreme Court has not ruled upon whether age groups are 'distinctive' enough for sixth amendment purposes ... every circuit that has considered this issue, except the First, until now, has ruled against appellant's contention. *See United States v. Potter*, 552 F.2d 901, 905 (9th Cir.1977); *United States v. Olsen*, 473 F.2d 686, 688 (8th Cir.), *cert. denied*, 412 U.S. 905, 93 S.Ct. 2291, 36 L.Ed.2d 970 (1973); *United States v. Guzman*, 337 F.Supp. 140, 145 (S.D.N.Y.), *aff'd* 468 F.2d 1245 (2d Cir. 1972), *cert. denied*, 410 U.S. 937, 93 S.Ct. 1397, 35 L.Ed.2d 602 (1973); *Brown v. Harris*, 666 F.2d 782, 783–84 (2d Cir. 1981), *cert. denied*, 456 U.S. 948, 102 S.Ct. 2017, 72 L.Ed.2d 472 (1982); *United States v. Gast*, 457 F.2d 141 (7th Cir.), *cert. denied*, 406 U.S. 969, 92 S.Ct. 2426, 32 L.Ed.2d 668 (1972); *Davis v. Greer*, 675 F.2d 141, 146 (7th Cir.), *cert. denied*, 459 U.S. 975, 103 S.Ct. 310, 74 L.Ed.2d 289 (1982); *United States v. Di Tommaso*, 405 F.2d 385, 391 (4th Cir.1968), *cert. denied*, 394 U.S. 934, 89 S.Ct. 1209, 22 L.Ed.2d 465 (1969); *Cox v. Montgomery*, 718 F.2d 1036, 1038 (11th Cir.1983); *United States v. Test*, 550 F.2d 577 (10th Cir.1976). We are convinced not by the weight of their numbers but by that of

the logic and policy they espouse. We thus join them."

*Id.* at 997–1000.[5]

The *Barber* court refused to recognize young people as a cognizable group because of the difficulty presented in drawing the line age-wise to define the group. *Id.* at 998. This court entirely agrees with and adopts by reference the rationale of the *Barber* court on this issue. 772 F.2d at 997–1000.

Other courts have refused to recognize young people as a cognizable group for various reasons. *See e.g., United States v. Potter,* 552 F.2d 901, 905 (9th Cir.1977) (age group of 18–34 lacks commonality and can be effectively represented by other age groups); *United States v. Kleifgen,* 557 F.2d 1293, 1296 (9th Cir.1977) (young have diverse "attitudes and characteristics which defy classification.").

This court agrees with the rationale of the circuits that have ruled on this issue. It cannot be said, as petitioner contends, that 18 to 29 year olds in Boone County, Kentucky comprise a cognizable group. There is no indication that 18 to 29 year olds can be easily and clearly defined as a distinct group, that they have a basic similarity in attitude, ideas or experience, or that the group's interests cannot be adequately represented if it was to be excluded from the jury selection process.

Given these considerations, this court must hold that petitioner has failed to demonstrate that he was improperly indicted and tried by jurors not representing a fair cross-section of the community.

■ With regard to petitioner's contention that women and young people were underrepresented as grand jury foremen and commissioners, petitioner must fail here as well. As discussed above, young people are not a cognizable group, so petitioner's assertions that young adults were underrepresented as grand jury foremen and commissioners lacks merit. Further, petitioner, being a white male, lacks stand-

ing to allege equal protection violations for underrepresentation of women as grand jury foremen and commissioners. *See Smith v. Commonwealth,* 734 S.W.2d 437, 441–42 (Ky.1987).[6]

In addition, discriminatory selection of grand jury foremen is not a due process violation. *Hobby v. United States,* 468 U.S. 339, 104 S.Ct. 3093, 82 L.Ed.2d 260 (1984). The Court in *Hobby* stated that "[d]iscrimination in the selection of grand jury foremen—as distinguished from discrimination in the selection of the grand jury itself—does not in any sense threaten the interests of the defendant protected by the Due Process Clause." *Id.* at 344, 104 S.Ct. at 3096. Further, in Kentucky the position of grand jury foremen is ministerial in nature. *See Smith,* 734 S.W.2d at 442. In Kentucky, "the only duty of the foreman is to administer an oath to each witness." *Id. See also,* KRS 29A.250. Consequently, petitioner's assertion that improper composition of grand jury foremen denied him his constitutional rights lacks merit.

Lastly, petitioner has failed to present sufficient evidence to demonstrate a constitutional violation for alleged underrepresentation of women as jury commissioners. Petitioner's own statistical expert admitted that data was available on only 40 out of 66 jury commissioners and that such a large number of missing observations may have resulted in a biased sample. *See* T.R. Vol. VI 155. The expert also admitted that his own data shows an equal number of men and women as jury commissioners during the years 1977 through 1980. *See* T.E.H. at 94–95 (Sept. 23, 1987).

Even if it were true, as petitioner contends, that women were underrepresented as jury commissioners, petitioner has failed to offer any evidence which would indicate such imbalance caused him to be denied his right to a constitutionally fair trial. More than statistics showing an unequal number of males and females as jury commissioners is needed to show a constitutional viola-

---

**5.** Also, the Sixth Circuit has just recently held that young people are not a "distinctive group." *Ford v. Seabold,* 841 F.2d 677, 682 (6th Cir.1988).

**6.** *See also Rose v. Mitchell,* 443 U.S. 545, 99 S.Ct. 2993, 61 L.Ed.2d 739 (1979) (in order to show equal protection violation, defendant must show procedure used resulted in substantial underrepresentation of *group to which he belongs* ).

tion.[7] *See e.g. Carter v. Jury Commission of Greene County,* 396 U.S. 320, 338, 90 S.Ct. 518, 528, 24 L.Ed.2d 549 (1970) (total absence of blacks from Greene County jury commission did not amount to a *prima facie* showing of discriminatory exclusion absent more proof, even though majority of population was black).

Therefore, it is clear that the petitioner has not met his burden of proving that his rights were constitutionally violated with regard to this issue.

### ISSUE XVIII—Excusing Juror Parton for cause.

Petitioner's eighteenth contention of error is that he was denied his Sixth, Eighth and Fourteenth Amendment rights when the trial court excluded a juror who, petitioner contends, was equivocal on whether he could consider imposing a sentence of death. Petitioner argues that a venireman named Parton was improperly excused for cause in that at times during his examination he stated he could never impose the death penalty, while at other times he was not so sure. Petitioner contends that Parton was equivocal on the issue and therefore excluded from the jury in violation of the *Witherspoon* standard.

The *Witherspoon* standard was set out by the United States Supreme Court in *Witherspoon v. Illinois,* 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968). In *Witherspoon,* the Court noted that a juror may be excused for cause if the juror was *unmistakably clear* that he would *automatically* vote against the death penalty regardless of the evidence presented in the case at bar, or that his attitude toward the death penalty prevented him from making an impartial decision on guilt. *Id.* at 522–23 n. 21, 88 S.Ct. at 1777 n. 21 (emphasis added). The Court noted that under the Sixth and Fourteenth Amendments:

"[A] State may not entrust the determination of whether a man should live or die to a tribunal organized to return a

verdict of death.... [A] sentence of death cannot be carried out if the jury that imposed or recommended it was chosen by excluding veniremen for cause simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction."

*Id.* at 521–22, 88 S.Ct. at 1776–77.

The strict *Witherspoon* standard was relaxed in *Adams v. Texas,* 448 U.S. 38, 100 S.Ct. 2521, 65 L.Ed.2d 581 (1980). In *Adams,* the Court noted that prospective jurors may be eliminated for cause if their feelings about the death penalty would "lead them to ignore the law or violate their oaths." *Id.* at 50, 100 S.Ct. at 2529. The Court stated that a juror may be excluded whose "views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath. The State may insist ... that jurors will consider and decide the facts impartially and conscientiously apply the law as charged by the court." *Id.* at 45, 100 S.Ct. at 2526. More specifically, the Court described instances that do not constitute a violation of their oaths or disobedience of the Court's instructions:

"Nor in our view would the Constitution permit the exclusion of jurors from the penalty phase of a Texas murder trial if they aver that they will honestly find the facts and answer the questions in the affirmative if they are convinced beyond reasonable doubt, but not otherwise, yet who frankly concede that the prospects of the death penalty may affect what their honest judgment of the facts will be or what they may deem to be a reasonable doubt. Such assessments and judgments by jurors are inherent in the jury system, and to exclude all jurors who would be in the slightest way affected by the prospect of the death penalty or by their views about such a penalty would be to deprive the defendant of the impar-

---

**7.** The only authority offered by petitioner to support this contention is *Rose v. Mitchell,* 443 U.S. 545, 99 S.Ct. 2993, 61 L.Ed.2d 739 (1979). That case, however, was an equal protection case and as such provides no support to petitioner because he lacks standing to assert an equal protection charge.

tial jury to which he or she is entitled under the law."

*Id.* at 50, 100 S.Ct. at 2529.

The *Adams* standard does away with the "automatic" and "unmistaken clarity" language of *Witherspoon,* and consequently, the test of proper exclusion for cause is whether a juror's views on capital punishment "would prevent or substantially impair the performance of his duties as a juror in accordance with his instruction and his oath." *Wainwright v. Witt,* 469 U.S. 412, 105 S.Ct. 844, 851–52, 83 L.Ed.2d 841 (1985) (quoting *Adams,* 448 U.S. at 45, 100 S.Ct. at 2526). In *Witt,* the Supreme Court also provided that a trial judge's decisions on excluding prospective jurors because of their opposition to capital punishment are factual issues subject to deference under 28 U.S.C. § 2254(d). *Witt,* 105 S.Ct. at 853–55. Section 2254(d) provides that on petition for a writ of habeas corpus, a federal reviewing court must accord any findings of the state courts on factual issues a presumption of correctness. *See also Patton v. Yount,* 467 U.S. 1025, 104 S.Ct. 2885, 2891–93, 81 L.Ed.2d 847 (1984) (question of individual juror's partiality is one of fact). Further, the *Witt* Court declined to require the trial court to issue specific written findings of fact on excusal when the finding was evident from the record of the *voir dire. Witt,* 105 S.Ct. at 855.

The law on this issue is very clear; it is the application of the law to the facts at hand that must be examined. A brief look at relevant portions of the transcript of Parton's *voir dire* is necessary for a thorough analysis of Parton's attitude concerning the death penalty although such a reading cannot recreate the demeanor and credibility of the venireman. *See e.g. Yount,* 467 U.S. 1025, 1038, 105 S.Ct. 2885, 2892, 81 L.Ed.2d 847 (1984) ("the determination is essentially one of credibility, and therefore largely one of demeanor."). A thorough examination will reveal whether Parton's *voir dire* meets the *Witherspoon* standard as refined in *Adams* and *Witt, supra.*

The relevant portions of the *voir dire* transcript are as follows:

"MR. MATHIS for the state and MR. PARTON

"Q. The offense of murder in Kentucky is in some instances a capital offense, under certain circumstances. So one of the most important questions that I will ask you is with respect to your personal feelings about the death penalty. How do you think you feel about it as you sit there, from a personal point of view, not as applies to this case or any other case, but how do you feel about the imposition of the death penalty in general?

"A. I am not for capital punishment. I never have been.

"T.E. Vol. XVII 2519.

"Q. Mr. Parton, the fact that you as a prospective juror may voice general objections to the imposition of the death penalty or entertain some conscientious or religious scrupples [sic] against it's [sic] inflection [sic] does not in and of itself preclude you from serving as a juror in the trial of this case.... [D]o you have an objection against the imposition of the death penalty?

"A. I suppose I really don't understand that, because if I have an origin of feeling then that origin of feeling is going to impose by [sic] feeling about the death penalty.

"Q. [D]o you have such a feeling?

"A. Yes, I do.

"Q. Do you believe that feeling would preclude you from considering a recommendation of death in this case or in any other case?

"A. Yes, I do.

"Q. Now, Mr. Parton, let me give you some examples and we will go as far as we can with some examples, and we appreciate your candor, we truly do. If Hitler were on trial for killing the Jews, for example, would you be unable to consider the imposition of the death penalty in that case?

"A. Yes, because I think he would have been better in prison, had he lived his mind would have been terrifically researched and I think I would have been more for that.

"Q. Let's suppose we have an airplane flying over Boone County with a load of people on it and some terrorist blows it up. Would you be unwilling to consider the death penalty in that case?

"A. Yes.

"Q. Now, we get a little closer to home, let's say that your mother or father or wife or child were killed by an intruder in a robbery or however, [sic] would you likewise carry your feeling in that case if you were a juror, and obviously you wouldn't be, but if you were, would you not be able to consider the death penalty as a recommendation in that case?

"A. I think you hit a point, I wouldn't be a juror and I wouldn't be a fair juror. I would expect to have a fair jury.

"Q. Well let's just say that you were a juror in that case, could you consider it?

"A. I think I would be more, you know, you are talking about emotional feelings now, and I don't think that is a fair question to ask me. Of course if it is someone that you love very dearly that is very close to you it is hard for you to make a rational decision and I wouldn't want to make that decision.

"Q. Okay, you might want to make—want to have retrobution [sic], let's say you were a juror and say it was someone close to you, friend or family member, would you— do you think on the bottom line that you would be able to consider the imposition of death penalty in that case?

"A. No, I wouldn't.

"Q. You couldn't consider it in that case?

"A. No, I wouldn't.

"Q. You couldn't consider it in that case?

"A. No.

"Q. Can you, as you sit there, conceive of any case where your feelings would be overcome and you would recommend the death penalty if you were a juror in a case?

"A. No.

"*Id.* at 2527–31.

⋅ ⋅ ⋅ ⋅ ⋅

"MR. MONOHAN for the defendant and MR. PARTON

"Q. You do understand that the Judge will instruct you that one of the several punishments possible in this murder case will be a recommendation to him of the death sentence and that other punishments will be from twenty years up to any number of years?

"A. Yes sir.

"Q. Or live [sic] imprisonment, there will be that full range of punishments in this case. And all that you have to do to be able to sit fairly as a juror is to be able to consider all of those punishments. Mr. Mathis' questions to you and our questions to you are not whether you would give the death sentence in this case or in any other case, just whether or not you could consider it. So now, with that explanation of the difference between give and consider and the explanation that the Judge will instruct you that you must consider all of those punishments, could you consider capital punishment in those sort of emotional cases that Mr. Mathis asked you about?

"A. Definitely could be considered.

"*Id.* at 2532–33.

"THE COURT and MR. PARTON

"Q. In that situation would the death penalty be a viable option?

"A. No, it wouldn't. I could consider it and look into it, but I don't think I could actually make a decision on that.

"Q. Would you automatically reject it?

"A. The way Mr. Monohan explained it I could consider it, but I doubt very much whether I would accept it.

"*Id.* at 2533.

"MR. MATHIS for the state and MR. PARTON

"Q. Mr. Parton, can you think of any circumstance in which you as a member of a jury would agree to the recommendation of the death penalty?

⋅ ⋅ ⋅ ⋅ ⋅

"A. I can sit and ponder a decision and come up with a decision, but right now what I am saying, not knowing all the facts, I doubt very much whether I could accept the death penalty. Now if—you

know, it would have to be a really terrific proving to me to make me change my mind at this point.

"Q. Okay, what would it take to prove to you that you would vote for the death penalty, what kind of a case?

"A. I don't know at this point because I can't imagine myself going that route.

"Q. Is there any kind of a case that you can conceive of now that you could participate in as juror and recommend the imposition of the death penalty?

"A. No.

"Q. None that you can conceive of?

"A. No, I think you have to know a little bit more about me to understand that because my position in this County is restoring and rehabilitating and caring for people and I have too much of a reverence for life to really take someone else's and that is basically how I feel. I am sorry.

"Q. Well it is not a question of being sorry. There is no right or wrong—

"A. Well I am trying to explain and I don't think in my present state of mind that I could do that to anyone.

"Q. In this case or in any other case?

"A. Right, I think there is to [sic] much rehabilitation that can be made.

"Q. Okay, does that mean that you feel you would reject an instruction—

"A. I am saying that I could consider it, but I doubt very much if I could accept it at this point.

"Q. Well what does consider mean to you, that may be the problem we are having?

"A. Consider means, you know, like I was maybe rash and saying that I really don't believe in this or that, but I think what Mr. Monohan was explaining to me was that there were other routes to go and as long as I considered all three that was the most important thing and come up with a decision I felt was right for me.

T.E. Vol. XVII 2534–36.

"Q. Do you feel as though, because of your personal feelings, that is what we are really trying to get, that you would reject that as a possible verdict that you and your fellow jurors might return in this case?

"A. At this point yes, without knowing anything else, yes.

"Q. Well in any case that you could conceive of, do you feel that you could ever be a part of a jury that recommended the imposition of the death penalty?

"A. No.

"Q. There is no circumstance that you could—no crime that you could conceive of it?

"A. No.

"Q. Okay, the other option, what would you do, for example, with the feelings that you have, I mean as you read those instructions of the Court and those three alternatives, what do you feel like, let's start at the bottom and it says you may recommend the imposition of the death penalty and you may recommend life and you may recommend twenty years or more, what I am saying is, do you believe you would go on to those other two alternatives as one of the appropriate punishments in this case?

"A. What I am saying right now is knowing what I know right now, I would say that I feel like I would probably be thinking of life imprisonment at this point. I really don't particularly think that anyone who has been found guilty of a crime or murder or what have you should be pardoned or paroled within a certain period of time, because I really do think that rehabilitation is necessary and I do think they should—and anyone, I am not talking about any particular case, any case, I feel like they should be imprisoned and rehabilitated.

"Q. So you feel like it would be in your judgment in this case or any other case involving murder that you could conceive of, your judgment would be life or less, life imprisonment or less?

"A. I am not saying less, I am saying life.

"Q. Only life?

"A. At this point, yes.

"Q. For murder cases?

"A. Yes.

"*Id.* at 2537–39.

"Q. Okay, do you feel like you would reject the imposition of the death penalty as a juror?

"A. Yes.

"Q. Or any other case,—in this or any other case?

"A. Yes.

"Q. You don't believe you could ever vote for it in this or any other case?

"A. No.

"Q. Is there any doubt in your mind about that?

"A. No.

"*Id.* at 2542–43."

■ Clearly, Mr. Parton was properly excluded from the jury under the present standards set out by the United States Supreme Court. Parton stated time and time again that he did not believe in capital punishment and that he could not impose such a penalty even in the most extreme of cases. Furthermore, Parton specifically stated that he could not accept the court's instruction pertaining to the death penalty. Clearly, Parton's beliefs would substantially impair his ability to perform his duties as a juror and to follow the judge's instructions. Only in one question of the *voir dire* conducted by defense counsel did Parton express any type of equivocation, and immediately thereafter, reaffirmed his strong convictions against the death penalty when questioned by the trial judge. Under the loosened standards set forth by the *Witt* Court, *supra*, the State need not show that Parton's views would clearly dictate that he would automatically vote against the death penalty regardless of the evidence presented, but only that such beliefs would substantially impair the performance of his duties.

Surely, a reading of the *voir dire* transcript demonstrates that Parton met the *Witt* standard and arguably, even the stricter *Witherspoon* standard. Hence, Parton's removal for cause was proper. There is no evidence or arguments presented as to why the presumption of validity of the trial judge's findings should be disturbed. *See* 28 U.S.C. § 2254(d). *See also*

*Yount,* 467 U.S. 1025, 1036–40, 104 S.Ct. 2885, 2891–93, 81 L.Ed.2d 847 (1984).

*ISSUE XIX—Whether consideration of the petitioner's underlying robbery conviction as an aggravating circumstance in petitioner's sentencing for murder violated the constitutional prohibition against double jeopardy.*

■ Petitioner argues that use of the petitioner's robbery conviction to aggravate the murder conviction to a capital offense was a violation of double jeopardy because he was already convicted of the robbery and sentenced to twenty years.

The respondent contends that "double counting" of the robbery during the penalty phase as an aggravating circumstance does not constitute double jeopardy.

Petitioner seems to be contending that consideration of the robbery as an aggravating circumstance during the penalty phase constitutes "multiple punishment for the same offense" and/or a "second prosecution for the same offense after conviction." *See Pryor v. Rose,* 699 F.2d 287, 289 (6th Cir.1983). Petitioner claims *Pryor* stands for the proposition that a death sentence may not be given if based on the double use of the sole aggravating circumstance of first degree robbery. However, in *Pryor,* the Sixth Circuit held that a petitioner's convictions and consecutive sentencing for (1) robbery with a deadly weapon, and (2) assault with intent to commit robbery with a deadly weapon, were multiple punishments for the same offense because the petitioner's acts involved "the same basic elements of wrongful conduct." *Id.* at 292. In reality, the petitioner was sentenced twice for only one offense. On the contrary, that is not the situation in this case. Here Kordenbrock was convicted of robbery and murder. Clearly, these offenses are "separate offenses" and do not involve the same basic elements of wrongful conduct.

States may constitutionally "double count" at the death penalty stage, by using as an aggravating circumstance, the murder committed in the course of a robbery. *See e.g., Evans v. Thigpen,* 631 F.Supp.

274, 283–84 (S.D.Miss.1986) *citing Gray v. Lucas,* 677 F.2d 1086, 1104–05 (5th Cir. 1982). Further, while the Supreme Court has not addressed this particular issue, it has repeatedly upheld death penalty sentences in which the robbery is used as an aggravating circumstance. *See e.g., Gregg v. Georgia,* 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976); *McCleskey v. Kemp,* —— U.S. ——, 107 S.Ct. 1756, 95 L.Ed.2d 262 (1987). *See also Lowenfield v. Phelps,* —— U.S. ——, ——, 108 S.Ct. 546, 555, 98 L.Ed.2d 568 (1988) ("fact that the aggravating circumstance duplicated one of the elements of the crime does not make this sentence constitutionally infirm."). Even more authoritative is *Williams v. Oklahoma,* 358 U.S. 576, 79 S.Ct. 421, 3 L.Ed.2d 516 (1959), wherein the facts presented the odd scenario where the sentencer considered the aggravating circumstance of murder committed during the course of a kidnaping to give the petitioner the death penalty on the kidnaping charge. The Court stated:

> "Certainly one of the aggravating circumstances involved in this kidnaping crime was the fact that petitioner shot and killed the victim in the course of its commission. We cannot say that the sentencing judge was not entitled to consider that circumstance, along with all the other circumstances involved, in determining the proper sentence to be imposed for the kidnaping crime. And in view of the obvious fact that, under the law of Oklahoma, kidnaping is a separate crime, entirely distinct from the crime of murder, the court's consideration of the murder as a circumstance involved in the kidnaping crime cannot be said to have resulted in punishing petitioner a second time for the same offense...."

358 U.S. at 586, 79 S.Ct. at 427.

Therefore, the petitioner's argument on this issue fails.

### ISSUE XX—Did petitioner have a constitutional right to voir dire the trial judge?

Petitioner's twentieth contention of error is that his Eighth and Fourteenth Amendment rights were violated when the trial judge refused to answer questions about his ability to sit on the case and sentence the petitioner. Following *voir dire* of the jury panel, petitioner's counsel requested the trial judge to answer eight questions. T.E. Vol. XXIII 3317–18. Petitioner argued that this procedure was necessary because the trial judge was the "ultimate sentencer". *Id.* The following questions were submitted by the petitioner to the trial judge:

1. Under what circumstances will you accept the jury's recommendation of punishment?

2. Under what circumstances will you not accept the jury's recommendation of punishment?

3. What types of murders would you sentence a person to death for?

4. In what case is a sentence of life imprisonment appropriate for murder?

5. Can you consider the following mitigating factors in determining defendant's sentence: his diminished capacity; effect of drugs on his mental state; his family upbringing; his motorcycle wreck; his age; his lack of prior violent crimes; the effect of his service in the Marines; his extreme mental or emotional disturbance; his ability to be rehabilitated.

6. Can you sentence Paul without considering parole?

7. Will you consider Paul's indictment for murder in Kenton County in sentencing him in this case?

8. Have you ever lowered a jury's sentence?

T.R. Vol. XI 739.

Petitioner's motion was denied, as was his motion to have the answers entered in the record by avowal. T.E. Vol. XXIII 3320–3321.

Petitioner's twentieth contention of error is without merit. There is no state or federal authority supporting petitioner's contention that he has a constitutional right to *voir dire* the trial judge. Conversely, the Supreme Court of Kentucky commented that such request of petitioner

was absurd. *Kordenbrock v. Commonwealth of Kentucky*, 700 S.W.2d 384, 388 (Ky.1985). In addition, the Sixth Circuit has stated that a criminal defendant has no right to have his case heard by a particular judge. *Sinito v. United States*, 750 F.2d 512, 515 (6th Cir.1984). Similarly, the Fifth Circuit has noted that federal district judges will disqualify themselves in only those cases contemplated by statutes; parties are not given a peremptory challenge to the judge. *Danielson v. Winnfield Funeral Home of Jefferson, Inc.*, 634 F.Supp. 1110, 1116 (E.D.La.1986) *affirmed in part* 820 F.2d 1222 (5th Cir.1987). Instead of *voir diring* the trial judge, a recusal motion is the proper remedy if a defendant should discover bias through the judge's actions at trial. *See* KRS 26A.015; 28 U.S.C. § 144. Furthermore, although the issue of bias could be raised on appeal, petitioner's remedies do not include a *voir dire* of the trial judge.

*ISSUE XXI—Whether petitioner was denied his constitutional right of effective assistance of counsel when the trial court required the defense to voir dire the jury before it ruled on petitioner's motion to suppress and his motion for a grant of immunity.*

 The trial judge required the defense to conduct *voir dire* before there were hearings and rulings on petitioner's motions to suppress his confession, a witness' identification of the petitioner, as well as his motion for a grant of immunity to a defense witness. Initially, the petitioner agreed that the hearings should take place after *voir dire* because of the concern that pretrial publicity with regard to the motions had the potential for unfair prejudice to prospective jurors. The petitioner later changed his position and objected to being required to *voir dire* the jury before the hearings were held, claiming that the hearings were required for the petitioner to know what his defense would be.

 In the Commonwealth of Kentucky, as well as the federal system, the trial judge has broad discretion concerning the scope of *voir dire*. *See e.g., Turner v.*

*Murray*, 476 U.S. 28, 106 S.Ct. 1683, 1689 n. 12, 90 L.Ed.2d 27 (1986); *United States v. Johnson*, 584 F.2d 148 (6th Cir.1978); *United States v. Goode*, 814 F.2d 1353 (9th Cir.1987); *Ward v. Commonwealth*, 695 S.W.2d 404, 407 (Ky.1985). Furthermore, the basic "function of *voir dire* is to allow for the impaneling of a fair and impartial jury through questions which permit the intelligent exercise of challenges by counsel." *Johnson*, 584 F.2d at 155 (quoting *United States v. Anderson*, 562 F.2d 394, 398 (6th Cir.1977)). The trial judge abuses this discretion when limitations he places on the scope of the examination threaten to undermine the purpose of conducting *voir dire. Anderson*, 562 F.2d at 398. However, petitioner cites no authority in support of his argument and this court cannot say that the trial judge's action of holding the hearing after *voir dire* was an abuse of discretion or thwarted the basic purpose of "impaneling a fair and impartial jury." Therefore, Kordenbrock's petition is denied as to this issue.

*ISSUE XXII—Whether the exclusion of defense witness' testimony concerning the nature of electrocution violated the petitioner's constitutional rights.*

 The petitioner claims that the testimony of Harry Bolser, a reporter who witnessed twenty-two electrocutions, should not have been excluded during the sentencing phase of trial. The respondent contends the testimony was properly excluded as irrelevant.

Petitioner's argument is without merit because evidence concerning executions is properly excludable as irrelevant. *Shriner v. Wainwright*, 715 F.2d 1452 (11th Cir. 1983), involved facts very similar to this case. The *Shriner* court stated:

"Shriner claims that the trial court, by precluding a Methodist minister from testifying about the three electrocutions he witnessed, denied the jury evidence relevant to 'evolving standards of decency,' in contravention of *Lockett v. Ohio....* Shriner misreads *Lockett* while the plurality opinion indicated that a defendant

in a capital case must be permitted to introduce virtually any evidence relating to his character, record or offense, it did not hold that all evidence proffered by the defendant concerning the propriety of electrocutions in general must be admitted. Rather, the plurality explicitly admonished: 'Nothing in this opinion limits the traditional authority of a court to exclude, as irrelevant, evidence not bearing on the defendant's character, prior record, or the circumstances of his offense.' *Id.* [438 U.S.] at 604 n. 12, 98 S.Ct. at 2965 n. 12. The exclusion, on relevancy grounds, of the minister's proffered testimony, which did not at all concern Shriner's background or the crime committed, did not violate *Lockett.*"

*See also Johnson v. Thigpen,* 623 F.Supp. 1121, 1130 (D.Miss.1985) ("Nothing in *Lockett* and its progeny even remotely suggests that the exclusion of such evidence, [describing executions] ... implicates the Constitution.").

This court is in agreement with the analysis in these cases and holds that Kordenbrock's petition on this issue must be denied.

*ISSUE XXIII—Does the Constitution prohibit states from "death qualifying" juries in capital cases?*

Petitioner's twenty-third contention of error is that the exclusion for cause of five veniremen because of their feelings about the death penalty denied petitioner his Sixth, Eighth and Fourteenth Amendment rights in that such action resulted in the selection of an unrepresentative jury that was more prone to convict and to give the death sentence than a properly selected jury. During the *voir dire* examination at petitioner's trial, these five prospective jurors stated that they were totally opposed to the death penalty in all circumstances. Petitioner contends that the exclusion of the jurors denied him of his right to a representative, impartial jury drawn from a fair cross-section of the community. Further, petitioner notes that this effect was aggravated by the Commonwealth's use of peremptory challenges to exclude jurors who expressed any qualms regarding capi-

tal punishment. *See e.g.,* T.E. Vol. XX 3148.

Petitioner's twenty-third contention of error is without merit because the United States Supreme Court has ruled to the contrary. In *Lockhart v. McCree,* 476 U.S. 162, 106 S.Ct. 1758, 1764, 90 L.Ed.2d 137 (1986), the Court held that removal for cause of prospective jurors whose opposition to the death penalty was so strong that it would prevent or substantially impair them in the performance of their duties at the sentencing phase of trial did not violate the Constitution. Further, the *Lockhart* Court held that a "death qualified" jury does not violate the fair cross-section requirement of the Sixth Amendment. *Id.* 106 S.Ct. at 1764–66. Lastly, the Supreme Court in *Lockhart* held that a "death qualified" jury does not violate the Sixth Amendment right to an impartial jury. *Id.* at 1770.

Clearly, the *Lockhart* case forecloses any argument on the part of the petitioner. The circuits have recognized that such arguments are rendered moot by the United States Supreme Court's ruling in *Lockhart. See e.g., Coleman v. Brown,* 802 F.2d 1227, 1233 (10th Cir.1986); *Cartwright v. Maynard,* 802 F.2d 1203, 1218 (10th Cir.1986) (*modified on other grounds,* 822 F.2d 1477 (10th Cir.1987)). *See also Gray v. Lucas,* 677 F.2d 1086, 1098 n. 12 (5th Cir. 1982) (prospective jurors' opposition to death penalty that would prevent them from being able to return death penalty under any circumstances meant they were properly excluded from jury).

Petitioner's reliance on *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed. 2d 69 (1986) is not well taken in that *Batson* and the case at hand can be readily distinguished. *Batson* involved a claim by a black criminal defendant that the State's use of peremptory challenges to exclude members of his own race from the petit jury denied him Equal Protection. *Id.* In the case at hand, there is no claim of purposeful discrimination in the selection of the petit jury as to defendant's racial group. Clearly, *Batson* is inapplicable to

petitioner's case and cannot be asserted by him in furtherance of this present contention of error.

 In addition, a state court's finding that a prospective juror is biased is a "factual finding" and is entitled to a presumption of validity pursuant to 28 U.S.C. § 2254(d). *Coleman*, 802 F.2d at 1232 (citing *Wainwright v. Witt*, 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985)). *See also Smith v. Wainwright*, 777 F.2d 609, 613 (11th Cir.1985). Petitioner has not set forth any grounds as to why exception should be made to this presumption. Consequently, the decision of the trial court as to this issue should be affirmed.

### CONCLUSION

The role of this court in his habeas corpus proceeding is not to substitute its judgment for that of the state trial judge and jury as to whether Paul Kordenbrock deserves the death penalty. Nor is this court to sit as the state appellate court to pass on routine trial errors. Rather, the sole function of this court is to determine whether the state court proceedings were tainted by a *federal constitutional* violation.

A meticulous study of the entire state record reveals a fundamentally fair trial by a fair and conscientious trial judge and an impartial jury. The trial court proceedings were reviewed by the Supreme Court of Kentucky, a court composed of members elected from throughout the state, who are well insulated from local pressures. That court found no reversible error.

In short, it is the law of the land that the death penalty is a constitutional punishment for heinous crimes, if fair proceedings are utilized to impose it. Having cut through the barrage of technicalities raised by ingenious and indefatigable defense counsel, the court is convinced beyond any doubt that Paul Kordenbrock brutally killed a man in cold blood and attempted to kill another. He manifested a total lack of consideration for the lives or rights of others. His own defense psychiatrist cannot say that he can be rehabilitated. This receives little mention in the discussion of the twenty-three issues raised by the defense.

A constitutional penalty has been imposed by fair procedures. This court has no authority to interfere.

Therefore, the petition for the writ must be dismissed. A separate Judgment will enter concurrently herewith.